[No. G035041. Fourth Dist., Div. Three. Nov. 30, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LINDA JEAN TILLOTSON, Defendant and Appellant.

518

522

COUNSEL

Jean F. Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia, James Dutton and Deana L. Bohenek, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FYBEL, J.—

### INTRODUCTION

Linda Jean Tillotson unlawfully obtained credit reports and personal identifying information of several police officers and an Orange County Superior Court commissioner. In an attempt to violate a restraining order, she provided a nonprofit investigation organization with one officer's address and asked the organization to conduct surveillance of the officer while he was off

duty. Searches of Tillotson's home produced unlawfully obtained credit reports, controlled substances, and drug paraphernalia.

A 24-count information charged Tillotson with two counts of possession for sale of a controlled substance (counts 1 & 24), two counts of possession of controlled substance paraphernalia (counts 2 & 21), one count of possession of 28.5 grams or less of marijuana (count 3), three counts of computer access and fraud (counts 4–6), one count of computer access and fraud with injury (count 7), eight counts of identity theft (counts 8–14 & 22), five counts of acquiring access card account information (counts 15–19), one count of possession of a controlled substance (count 20), and one count of disobeying a court order (count 23). A jury convicted Tillotson on counts 1 through 9, 13, and 20 through 24, and acquitted her on counts 10 through 12 and 14 through 19. The trial court found true the enhancement charged on counts 4, 5, 20, 22, and 24 that Tillotson committed the crimes while released from custody on bail. The trial court, using count 1 as the principal term, sentenced Tillotson to a total prison term of 14 years four months.

We affirm the judgment as modified pursuant to part III. of the Analysis, except as explained in the following points 4., 6., 7., and 8. (corresponding to parts IV., VI., VII., and VIII. of the Analysis). As to each of Tillotson's contentions, we conclude:

1. On counts 4 through 7, the trial court correctly instructed the jury with CALJIC No. 3.01 on aiding and abetting liability. The trial court was not required to give CALJIC No. 3.14, which concerns accomplice liability.

2. Substantial evidence supported Tillotson's conviction on count 22 for identity theft in violation of Penal Code section 530.5, subdivision (a).

3. Tillotson was charged under count 23 with violating Penal Code section 166, subdivision (a)(4). Substantial evidence supported a conviction for the lesser included offense of attempt to violate that code section. The judgment as to count 23 is modified to reflect a conviction for attempt to violate Penal Code section 166, subdivision (a)(4) and, as modified, is affirmed and remanded for resentencing on that count.

4. On count 4, the trial court's jury instruction on Penal Code section 502, subdivision (c)(1) was erroneous because the instruction omitted an element of the offense. We find the error was prejudicial and therefore reverse the judgment as to count 4 and remand for retrial.

5. Under the accusatory pleading test, a violation of Penal Code section 502, subdivision (c)(3) appears to be a lesser included offense to a violation of section 502, subdivision (c)(1), alleged in count 4.

6. The trial court erred by imposing two three-year enhancements under Health and Safety Code section 11370.2, subdivision (c)—one on count 1 and the other on count 24.

7. When prison sentences are imposed on multiple secondary offenses and one primary offense, Penal Code section 12022.1, subdivision (e) requires only the sentence on one secondary count to run consecutively to the sentence on the primary count. The trial court has discretion to decide whether to impose the prison sentences on the remaining secondary counts to run consecutively or concurrently. The trial court erred by imposing sentences on counts 4, 5, 20, 22, and 24 to run consecutively to each other without stating reasons for doing so.

8. Because we reverse the judgment as to count 4, we need not resolve whether Penal Code section 654 required the trial court to stay imposition of sentence on counts 5, 6, and 7. On remand, the trial court should determine whether to stay imposition of sentence on those counts in light of the result of any retrial on count 4.

9. Based on the California Supreme Court decision in *People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (*Black*), we affirm the trial court's imposition of the upper term sentence on count 1.

We therefore affirm in part, reverse in part, and remand, as specifically described in the disposition.

FACTS

I.

*Searches of Tillotson's House*

A. *July 9, 2003 Search*

On June 26, 2003, around 7:00 p.m., Chad Ellenwood went to Tillotson's house on Heil Street in Huntington Beach to purchase methamphetamine. He bought $50 worth—about one-half of a gram—from her. After Ellenwood left Tillotson's house, police officers stopped his car and found the methamphetamine. He told the officers he had just purchased it from Tillotson.

On July 9, 2003, several Huntington Beach police officers executed a search warrant on Tillotson's house. Officer Carole Ortiz conducted a body

search of Tillotson. As Tillotson disrobed, her dress dropped to the floor, and Ortiz noticed a Ziploc baggie in the bodice. The baggie contained 4.73 grams of methamphetamine.

One officer found, behind a glass display case, a black pouch. Inside the black pouch, the officers found a pipe containing 520 milligrams of methamphetamine, six twisted plastic baggies containing a total of 16.74 ounces of methamphetamine, a plastic baggie containing 1.16 grams of methamphetamine, and another plastic baggie containing 4.76 grams of marijuana. Officer Mike Reilly found three more plastic baggies in a potted plant on top of a television set. Two of the baggies were empty, and the third contained 40 milligrams of methamphetamine. On top of Tillotson's desk, Reilly found a small amount of marijuana, and, in the top desk drawer, he found a plastic baggie holding about 100 smaller Ziploc baggies of the type used to package narcotics. Each baggie had small green dollar signs printed on it.

Officer Joshua Page searched the exterior of the house and found a small camera attached to its southwest corner. The camera was inside a cylindrical case and faced the front yard. The camera had a live feed into a television set in Tillotson's home office. Anyone approaching the front walk area would activate a motion sensor attached to the camera, setting off a beeper in Tillotson's home office.

Based on the items seized from Tillotson's house and the presence of video surveillance equipment, Officer Reilly concluded that Tillotson had possession of the controlled substances for purposes of sale.

Tillotson was arrested, and Commissioner Martin Engquist conducted her arraignment. Tillotson hated Commissioner Engquist, considered him a "son of a bitch," and believed he was part of a conspiracy against her. Tillotson obtained Commissioner Engquist's home address from the State Bar of California's Web site. Using the address, Tillotson's sister, Beatrice Huff, went to Commissioner Engquist's home, removed three bags of garbage from his garbage bin, and hauled them away in the back of a pickup truck.

B. *February 26, 2004 Search*

Sometime in 2003, Huntington Beach Police Detective Patrick Ellis was assigned to the fraud unit and was investigating an identity theft ring. He had learned the ring members were using a stolen Equifax account number and password to gain access illegally to Equifax's database and pull credit reports. Over a dozen people were involved in the ring. Ellis traced the ring to a former dental office employee named Mark Ohm, who had taken Equifax password information after being fired in June 2003. After firing Ohm, the

dental office failed to change the password, allowing him to access and compromise credit reports. The password was passed along to others, including Mike Quitoriano, who used the password to access the Equifax database from Tillotson's house on August 8, 2003. Ellis learned the ring's activities had compromised some 586 credit reports.

During the investigation, Huntington Beach Police Detective James Schoales received a letter from Equifax informing him his credit report had been compromised. After Schoales told Ellis about the letter, Ellis carefully searched a list of compromised credit reports for names of other law enforcement officers. He found the names of Huntington Beach Police Officers John Topartzer and John Van Holt, Cypress Police Sergeant Kenneth Ramsey, and Commissioner Engquist. Through Internet access and telephone records, Ellis learned all the officers' reports and Commissioner Engquist's report were run from Tillotson's house on August 8, 2003.

On February 26, 2004, a team of Huntington Beach police officers, including Ellis and the chief of police, executed a search warrant on Tillotson's house. In a wooden cabinet in Tillotson's home office, the officers found seven Equifax credit reports.

Tillotson was home during the search. She waived her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] and spoke to the officers. She admitted having the credit reports but claimed she had not downloaded and printed them. She told the officers a friend of hers named Baby Hernandez had brought a man named "Mike" to her house, where he set up a laptop computer. Mike went online, accessed the credit reports, and printed them. Ellis knew Mike to be Mike Quitoriano, who was involved in the identity theft ring under investigation. Ellis had learned from his investigation that Quitoriano was privy to the Equifax access code and password taken from the dental office.

The Equifax credit reports found at Tillotson's house included those for Detective Schoales, Sergeant Ramsey, Commissioner Engquist, Officer Van Holt, Officer Topartzer, and Los Angeles Police Officer James Katapodis. Tillotson was never authorized to obtain those reports or any credit reports from Equifax.

In a file cabinet in a bedroom of Tillotson's house, the police officers found five to 10 reports from "peopledata.com," an Internet search engine providing access to personal information in exchange for a fee. Those reports included one on Sergeant Kenneth Ramsey and one on Huntington Beach Police Officer Eric Ramsey (Sergeant Ramsey's brother). The officers also found a MapQuest printout plotting a trip from Tillotson's house to several police

officers' homes, a map to Sergeant Ramsey's home, an aerial photograph printout with a star marking Detective Schoales's home, and a printout from the California State Bar Web site providing Commissioner Engquist's name, home address, and bar status.

Tillotson told the officers she had paid a fee to run the peopledata.com reports and had obtained the reports to prove Sergeant Ramsey, Officer Topartzer, Detective Schoales, and Commissioner Engquist lived near each other and had conspired against her. Tillotson said she had contact with Officer Van Holt on several occasions. She recognized Officer Katapodis's name but could not remember whether she ran a report on him.

Tillotson said she was upset with Commissioner Engquist over her experience before him in 2003. She said: "I think he's a son of a bitch. I think what he did when I was in court—I want to make sure to hurt him." She denied using the information in the Equifax reports.

During the search on February 26, 2004, the officers also found a homemade pipe for smoking methamphetamine. Next to the pipe was a piece of cellophane, which is commonly used to package methamphetamine. The pipe contained 90 milligrams of methamphetamine, a usable amount.

C. *May 21, 2004 Search*

During the morning of May 21, 2004, Monte Huotari of the Orange County Sheriff's Department gang enforcement team was assigned to monitor Tillotson's house and had been instructed to detain her if she left. After watching Tillotson pull out of the driveway and drive past him, he initiated a traffic stop. Inside the car with Tillotson was Huff. Huotari handcuffed Tillotson and took her back to her house, where a search warrant was being executed.

During that search, Orange County Sheriff's Investigator Kurt Bourne found Ziploc baggies in a desk drawer and an electric gram scale in the hood of a sweatshirt. In Tillotson's home office, another investigator, Michele Hill, found a baggie containing a powdery substance, confidential telephone lists for the Anaheim Police Department, some Orange County Sheriff's Department bulletins, and some Anaheim Police Department paperwork. The television set in the office displayed a live feed of the front of the house. Hill followed the feed line to a small camera concealed in a birdhouse at the front of the house.

Orange County Sheriff's Deputy Julio Gomez entered the bedroom and found Tillotson's husband, Gregory Spooner, asleep. In the bedroom, Gomez

found a baggie containing 13.4 grams of methamphetamine hidden in a pair of women's overalls hanging in the closet. Gomez placed Tillotson under arrest. She was asleep in the patrol car on the way to the county jail, but suddenly awakened and said, "I'm going to call the media. . . . I'm going to tell them that the sheriff's department planted narcotics in my residence." The sheriff's deputies found no narcotics in Tillotson's house.

## II.

### *The Victims' Responses to Tillotson's Actions*

None of the police officers or Commissioner Engquist gave Tillotson authorization to have copies of the credit reports and personal information. None suffered monetary loss from the compromise of their credit information. Commissioner Engquist, however, became concerned for his safety when he learned Tillotson had copies of his credit report and other personal information. He obtained a restraining order against Tillotson and caused various Web sites to delete his personal information.

Sergeant Ramsey first encountered Tillotson in 1994. He since learned that Tillotson's Web site featured his name and that she had a file with copies of his signature. Tillotson's niece had obtained the signatures by taking receipts signed by Ramsey from a local carwash. Tillotson's actions prompted Ramsey to obtain a permanent restraining order (the Restraining Order) against Tillotson. The Restraining Order ordered Tillotson not to "contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, communicate by any means (including mail, fax, or e-mail), follow, stalk, destroy the personal property of, disturb the peace of, keep under surveillance, or block movements in public places or thoroughfares of" Ramsey, his wife, or his child. The Restraining Order was served on Tillotson, at her home, on May 10, 2004.

Detective Schoales learned that Tillotson obtained his personal information by searching for all persons with the last name of "Schoales" in the area. She had compiled a list of such persons, most of whom were Detective Schoales's relatives. As a result of Tillotson's actions, the district attorney mounted surveillance cameras on Schoales's house, and the Huntington Beach Police Department regularly checked the house when Schoales was on duty.

## III.

### *Tillotson's Contacts with the Police Complaint Center*

In April 2002, Tillotson went to a police station and asked to get some property back from a defendant. Detective Ellis, the desk officer at the time,

denied her request. Tillotson sent a letter to the chief of police claiming Ellis was rude and asserting Ellis would become the "bad cop of the month" on her Web site. Ellis later visited Tillotson's Web site (injusticebyconspiracy.com) where he was indeed named the bad cop of the month. Ellis monitored the site thereafter.

The Police Complaint Center (PCC), a national nonprofit organization, conducts hidden camera investigations of police departments and investigates claims of police misconduct on behalf of such organizations as the ACLU (American Civil Liberties Union) and the NAACP (National Association for the Advancement of Colored People). Tillotson contacted the PCC and, on May 10, 2004, spoke with Gregory Slate, who works for the PCC in Washington, D.C. Tillotson told Slate a lengthy story about her situation with the Huntington Beach Police Department. In the course of several telephone and e-mail exchanges, she requested the PCC investigate several Huntington Beach and Cypress police officers. On May 12, 2004, Tillotson and the PCC entered into a contract by which the PCC would conduct hidden camera investigations of the Huntington Beach and Cypress police departments.

After the contract was signed, Tillotson asked the PCC to expand the scope of the investigation by surveilling Sergeant Ramsey while he was off duty. She provided the PCC with Ramsey's home address and said she wanted it to catch Ramsey engaged in misconduct or in a compromising position, such as being with a prostitute. Tillotson did not inform the PCC that the Restraining Order forbade her from making contact with or surveilling Ramsey.

Slate informed Tillotson the PCC does not investigate police officers while off duty. As a result, she no longer wanted the PCC's services, and the contract "fell apart." A few weeks later, the PCC notified Ramsey of Tillotson's contacts with it.

### IV.

### *Defense Evidence*

Huff testified the Ziploc baggies found in Tillotson's house during the July 9, 2003 search were used to package jewelry, which Tillotson collected, and to hold darts. Huff testified that Ellenwood was a friend of Tillotson's and never bought methamphetamine from her. Huff's daughter (Tillotson's niece) obtained copies of Ramsey's signature 10 years ago when she worked at a carwash he frequented. Huff's daughter gave the copies to Tillotson. According to Huff, there was animosity between Tillotson and Ramsey.

Michael Vella testified he was at Tillotson's house to prepare an estimate to pressure wash the driveway when the house was searched on July 9, 2003. At

the time, Vella was on probation for possession of methamphetamine. He testified that when the police arrived, Steve Ballard, another person in the house, removed a black pouch from his trousers and threw it toward the window.

Danielle Forrest, Tillotson's niece, testified she had bought methamphetamine from Ballard several times. She and Ballard smoked methamphetamine together on July 9, 2003, at the home of a person named Phyllis. Ballard provided the methamphetamine, which he removed from a black pouch he carried in his trousers. Forrest testified that Tillotson used methamphetamine but did not sell it.

Calvin Lee, Huff's boyfriend, testified that he, Tillotson, Huff, and Vella each did a line of methamphetamine at Tillotson's house on July 9, 2003. Tillotson supplied the methamphetamine.

Spooner testified he had lived with Tillotson in the house on Heil Street in Huntington Beach since August 2003. Spooner used the word "cabal" to describe the police officers' conduct toward Tillotson. Spooner wrote letters to the Governor, the Commission on Judicial Performance, the Orange County Grand Jury, and the news media to complain of Commissioner Engquist's alleged mistreatment of Tillotson.

When the police officers searched Tillotson's house on May 21, 2004, Spooner was in the bedroom. He testified the methamphetamine found in the house that day was his. A month after the search, Spooner wrote a letter to Tillotson, stating: "What I'm getting at is that I'm in much better shape to fight this latest charge than you are. So, there it is, then. Worse comes to worse, I get this one." During his cross-examination, after that passage was read, Spooner commented, "I know that sounds bad, doesn't it?"

On August 23, 2004, Spooner wrote another letter to Tillotson stating, "[a]nd when I saw the cops on the monitor, I freaked. Connie and Frank ran into the bedroom and jumped in bed, I guess to pretend they were sleeping. I tried to get to the bathroom, to throw the damn shit down the toilet. But that ass Calvin answered the door like it was the pizza man. And I only had time to jump into the bedroom and stick the shit in the bibbies [sic], and get in bed myself."

Tillotson testified on her own behalf. She admitted being convicted in 1996 for felony possession of methamphetamine for sale. (The parties also stipulated that Tillotson had been convicted of felony possession of methamphetamine in 1996.) She testified that she and Sergeant Ramsey "dislike each other immensely" and that she had "issues" with Officers Topartzer, Van Holt,

and Katapodis, Detective Schoales, and with Commissioner Engquist. Tillotson asserted those officers had harassed her to the point she was afraid to leave her house alone. Tillotson testified that "every one of the officers have been on my bad cop of the month," on her Web site called "injusticebyconspiracy.com." She described the Web site as posting the names of police officers "who aren't too credible—or little funny stories about them."

Tillotson testified she obtained the officers' home addresses from the Internet. She plotted the addresses on a map to show the officers lived close to each other and to her. She testified a man named Baby Hernandez, who was doing work at her house, told her he had a friend, Mike Quitoriano, who could download more information on the officers. On August 8, 2003, Hernandez and Quitoriano arrived together at Tillotson's house, and set up a laptop computer. Tillotson gave Quitoriano a list of names and left the room. When she returned about two hours later, Quitoriano gave her a stack of reports. He told Tillotson he ran such reports routinely at the dental office where he worked. Tillotson claimed she did not know she had been given credit reports and was only interested in the addresses on them.

Tillotson testified she contacted the PCC and asked it to film her driving away from her house to prove she "could not leave [her] house without being pulled over." Tillotson later testified she has never had a driver's license. Tillotson claimed she never consummated an agreement with the PCC and believed it obtained Sergeant Ramsey's address from her sister.

Tillotson testified the camera attached to the exterior of her house was focused on her driveway to protect her car, a limited edition 1991 Pontiac Firehawk. (Ellis testified on rebuttal he was familiar with the Pontiac Firehawk, he had inspected Tillotson's car "bumper to bumper," and it was not a Firehawk.)

Tillotson was not working in 2003 and 2004. She testified her source of income was Social Security disability benefits. Tillotson had worked as a nurse's aide for 28 years until she became disabled in the 1990's. She claimed that in 1999 she won a retroactive Social Security benefit award of about $100,000 that was being paid in six-month installments.

ANALYSIS

I.

*The Trial Court Correctly Instructed the Jury with CALJIC*
*No. 3.01 and Was Not Required to Give CALJIC No. 3.14.*

Tillotson argues the trial court erred by not instructing with CALJIC No. 3.14 as to counts 4, 5, 6, and 7. We find no error.

■ Those counts charged Tillotson with violating, respectively, subdivision (c)(1), (2), (3), and (7) of Penal Code section 502, and were based on evidence Tillotson aided and abetted Quitoriano in accessing the Equifax database and obtaining the victims' credit reports on August 8, 2003. An element of aider and abettor liability is the defendant acted " ' "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) Although the trial court instructed the jury with CALJIC No. 3.01 ("Aiding and Abetting—Defined"), Tillotson asserts the trial court also should have given CALJIC No. 3.14.

CALJIC No. 3.01 states, in part: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime." The trial court here instructed the jury: "A person aids and abets the commission or attempted commission of a crime when he or she: with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and by act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime."

■ CALJIC No. 3.01 is accurate and complete. It is based on *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318], where the court suggested "an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense; (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."

CALJIC No. 3.14 is entitled "Criminal Intent Necessary to Make One an Accomplice." It states: "Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids, or assists in, the commission of a crime without that knowledge and without that intent or purpose is not an accomplice in the commission of the crime."

■ Assuming CALJIC No. 3.14 is relevant to aiding and abetting liability, it does not add anything not covered by CALJIC No. 3.01. When liability is based on aiding and abetting, *People v. Croy* (1985) 41 Cal.3d 1, 12, footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392] explained, "[the defendant's] knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator." CALJIC No. 3.01 completely instructed the jury on such intent. The trial court did not have to give CALJIC No. 3.14 too.

## II.

### *Substantial Evidence Supports the Conviction on Count 22.*

Count 22 charged Tillotson with using Sergeant Ramsey's identifying information in violation of Penal Code section 530.5, subdivision (a). Tillotson argues the evidence does not support her conviction under that count.

Penal Code section 530.5, subdivision (a) provides in relevant part: "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense . . . ." Thus, to be guilty under section 530.5, subdivision (a), the defendant must (1) willfully obtain personal identifying information of another person, and (2) use the identifying information for an unlawful purpose without the person's consent.

The evidence showed that Tillotson willfully obtained Sergeant Ramsey's address, first from an Internet source, peopledata.com, and then from an Equifax credit report. She later requested the PCC to surveil Ramsey and gave it his address to conduct the surveillance. A few days earlier, Tillotson had been served with the Restraining Order prohibiting her from surveilling Ramsey.

Tillotson argues giving Ramsey's address to the PCC was not unlawful because the PCC never conducted the requested surveillance. Tillotson's purpose in providing Ramsey's address to the PCC was to have Ramsey surveilled, which Tillotson knew would be a violation of the Restraining Order. As explained in part III., the evidence supported the jury verdict convicting Tillotson of an attempted violation of Penal Code section 166, subdivision (c)(4). Tillotson therefore used the identifying information for an unlawful purpose.

III.

*Substantial Evidence Supports a Conviction for Attempt to Commit the Crime Charged in Count 23.*

Tillotson argues substantial evidence does not support the jury verdict convicting her under count 23 of violating Penal Code section 166, subdivision (a)(4) (contempt of court). Count 23 alleged that Tillotson violated that code section by disobeying the terms of the Restraining Order. Although substantial evidence does not support a conviction for violation of section 166, subdivision (a)(4), the evidence does support a conviction for the lesser included offense of attempt to commit that crime. (See Pen. Code, § 664.)

■ Penal Code section 166, subdivision (a) provides that contempt of court constitutes a misdemeanor. Contempt of court includes "[w]illful disobedience of the terms as written of any process or court order or out-of-state court order, lawfully issued by any court, including orders pending trial." (*Id.*, § 166, subd. (a)(4).)

The Restraining Order prohibited Tillotson from, among other things, harassing or surveilling Sergeant Ramsey. Evidence at trial established the Restraining Order was served on Tillotson, at her home, on May 10, 2004. On May 12, 2004, Tillotson entered into a contract with the PCC to conduct "hidden camera testing" of Huntington Beach and Cypress police officers. Tillotson contacted the PCC and asked it to expand the scope of the investigation by surveilling Sergeant Ramsey while he was off duty. She gave Ramsey's home address to the PCC and said she wanted it to catch Ramsey engaging in misconduct or in a compromised position, such as being with a prostitute. Tillotson did not inform the PCC the Restraining Order forbade her from making contact with or surveilling Ramsey. The PCC representative informed Tillotson the PCC did not investigate police officers while off duty. Tillotson lost interest in the contract, and it was never performed. The PCC later notified Ramsey of Tillotson's contacts with it.

■ This evidence did not support the verdict convicting Tillotson of violating the Restraining Order. Tillotson did not "contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, communicate by any means (including mail, fax, or e-mail), follow, stalk, destroy the personal property of, disturb the peace of, keep under surveillance, or block movements in public places or thoroughfares of" Sergeant Ramsey. While we agree with the prosecution that Tillotson could not do through a third party what she could not do herself (see *State v. Noah* (2000) 103 Wn.App. 29, 45 [9 P.3d 858]), the PCC's only contact with Ramsey was to inform him of Tillotson's rejected surveillance request.

Tillotson's contacts with the PCC did amount, however, to the lesser included offense of attempt to violate Penal Code section 166, subdivision (a)(4). An attempt to commit a crime consists of a specific intent to commit the crime and " 'a direct but ineffectual act done towards its commission.' " (*People v. Jones* (1999) 75 Cal.App.4th 616, 627 [89 Cal.Rptr.2d 485].) " 'Although mere preparation such as planning or mere intention to commit a crime is insufficient to constitute an attempt, acts which indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient.' " (*Ibid.*)

In *People v. Superior Court (Decker)* (2007) 41 Cal.4th 1 [58 Cal.Rptr.3d 421, 157 P.3d 1017] (*Decker*), the California Supreme Court reaffirmed the slight-acts rule adopted by *People v. Anderson* (1934) 1 Cal.2d 687 [37 P.2d 67]. Under the slight-acts rule, " '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' " (*Decker, supra*, 41 Cal.4th at p. 8; see *People v. Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446] [attempted lewd conduct]; *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] [attempted robbery]; *People v. Anderson, supra*, 1 Cal.2d at p. 690 [attempted robbery].) In addition, "it is not necessary that the overt act be the last possible step prior to the commission of the crime." (*People v. Morales* (1992) 5 Cal.App.4th 917, 926 [7 Cal.Rptr.2d 358].) In response to our invitation, Tillotson and the Attorney General, respectively, filed letter briefs addressing *Decker.*

In *Decker*, the defendant wanted to have his sister killed so he could recover money she owed him. (*Decker, supra*, 41 Cal.4th at p. 9.) The defendant conducted research into professional killers, budgeted to pay for such services, evaluated how and where the murder should be done, and tested the level of security around his sister's residence. (*Ibid.*) The defendant contacted a gun dealer about killing his sister, and the gun dealer alerted the sheriff. (*Id.* at p. 5.) A sheriff's detective, posing as a hired assassin, met with the defendant on two occasions to discuss the killing. (*Id.* at pp. 5, 7.) The defendant and the detective agreed on the price, and the defendant provided the detective with detailed information about his sister, her home, her office, and her habits. (*Id.* at p. 9.) The defendant gave the detective the agreed-upon $5,000 downpayment, but before doing so, the detective warned him, " 'I want you to know, once I leave here, it's done. So, you sure you want to go through with it?' " (*Ibid.*) The defendant replied, " 'I am absolutely, positively, 100 percent sure, that I want to go through with it. I've never been so sure of anything in my entire life.' " (*Ibid.*)

In determining the evidence was sufficient to support a charge of attempted murder, the Supreme Court disapproved *People v. Adami* (1973) 36

Cal.App.3d 452 [111 Cal.Rptr. 544] (*Adami*), which Tillotson cites in her reply brief. The facts of *Adami* were similar to those of *Decker*. In *Adami*, the defendant solicited an undercover police officer posing as a hired assassin to kill the defendant's wife. (*Adami, supra,* 36 Cal.App.3d at p. 454.) The defendant gave the undercover officer a downpayment, a photograph of his wife, and a detailed description of her. (*Id.* at pp. 454–455.) The officer asked the defendant if he was going to change his mind. (*Id.* at p. 455.) The defendant answered no, and confirmed he wanted his wife killed. (*Ibid.*) The *Adami* court concluded the defendant's acts were merely of solicitation or preparation, which, in accordance with the "weight of authority," did not amount to attempted murder. (*Id.* at p. 457.)

In *Decker*, the Supreme Court found *Adami*'s analysis flawed in four ways. (*Decker, supra,* 41 Cal.4th at pp. 10–14.) First, and most importantly for our purposes, "the [*Adami*] opinion makes no mention of the slight acts rule, which has long been the rule for attempted crimes in California." (*Id.* at p. 10.) Second, *Adami* "misconceived the issue" as " 'whether the solicitation itself was sufficient to establish probable cause to believe that defendant attempted the murder.' " (*Decker, supra,* 41 Cal.4th at p. 11.) The *Decker* court explained the issue was whether a solicitation to commit murder, together with a completed agreement to hire a professional killer and making the downpayment under the agreement, was sufficient. (*Ibid.*) Third, *Adami* mistakenly assumed the evidence of solicitation and the evidence of attempt could not overlap: "There is thus no error in resting a finding of attempted murder in part on evidence that *also* tends to establish solicitation to commit murder and vice versa." (*Decker, supra,* 41 Cal.4th at pp. 12–13.) Finally, the Supreme Court rejected the contention that a solicitation to commit murder should not be treated differently because part of the agreed-upon fee has been paid. (*Id.* at p. 13.)

Under the slight-acts rule reaffirmed in *Decker*, the evidence was sufficient for a reasonable trier of fact to conclude that Tillotson harbored the intent to violate the Restraining Order and that she committed an act toward committing the crime. After being served with the Restraining Order, Tillotson entered into a contract with the PCC to conduct a surveillance of Huntington Beach and Cypress police officers—which would include Ramsey. She had arranged to transfer money to her PayPal account for payment of the contract fee. Tillotson testified she knew when she contacted the PCC that the Restraining Order prohibited her from surveilling Ramsey, but nonetheless asked the PCC to expand the scope of the investigation by surveilling Sergeant Ramsey while he was off duty. She told the PCC representative that Ramsey "had moved down the street from her," and that she "needed to engage him in misconduct, either on or off duty, it didn't matter." She provided the PCC with Ramsey's badge number and home address, and referred the PCC to her Web site to "show you a few obstacles I've had with

this Sgt[.] Ramsey." Tillotson's solicitation of the PCC was itself " 'sufficient to establish probable cause to believe that defendant attempted the [crime].' " (*Decker, supra*, 41 Cal.4th at p. 11.)

 In her letter brief, Tillotson asserts her inquiry about surveilling Ramsey "was no more than 'mere preparation,' if that." But "[w]hether acts done in contemplation of the commission of a crime are merely preparatory or whether they are instead sufficiently close to the consummation of the crime is a question of degree and depends upon the facts and circumstances of a particular case." (*Decker, supra*, 41 Cal.4th at p. 14.) Tillotson's inquiry was sufficiently close to the consummation of the crime for these reasons. Her intent to disobey the Restraining Order was unmistakable. Tillotson already had signed a surveillance contract, arranged to pay the contract fee, and provided information about Ramsey to the PCC. Had the PCC agreed to Tillotson's request, the intended design of violating the Restraining Order "w[ould] be carried out if not interrupted." (*Id.* at p. 13.)

The judgment as to count 23 therefore is modified to reflect a conviction for an attempted violation of Penal Code section 166, subdivision (a)(4). As modified, the judgment as to count 23 is affirmed, except for sentencing. On remand, Tillotson is to be resentenced on count 23.

IV.

*The Trial Court Erroneously Instructed the Jury on the Elements of a Violation of Penal Code Section 502, Subdivision (c)(1).*

Count 4 charged Tillotson with computer access and fraud under Penal Code section 502, subdivision (c)(1). Count 4 alleged that "[o]n or about August 08, 2003, in violation of Section 502(c)(1) of the Penal Code . . . TILLOTSON did knowingly and unlawfully access and without permission alter, damage, delete, destroy, and otherwise use data, a computer, a computer system, and a computer network belonging to EQUIFAX, in order to devise and execute a scheme and artifice to defraud, deceive, and extort, and to wrongfully control and obtain money, property, and data." Tillotson argues the trial court's instruction on section 502, subdivision (c)(1) erroneously omitted a required element. We agree.

Penal Code section 502, subdivision (c)(1) states: "Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense: [¶] (1) Knowingly accesses *and* without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network *in order to either* (A) devise or execute any

scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." (Italics added.)

The trial court's jury instruction No. 15.80[1] stated: "Every person who knowingly accesses without permission any computer, computer system, or computer network in order to defraud or wrongfully control or obtain data is guilty of a felony in violation of Penal Code section 502(c)(1). [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person knowingly accessed any computer, computer system or computer network; [¶] 2. The person did so without permission; and [¶] 3. The person did so in order to wrongfully control or obtain data."

Tillotson argues that instruction is erroneous in two respects. First, the instruction permitted the jury to find her guilty based on access alone, while Penal Code section 502, subdivision (c)(1) requires that the defendant both access the computer system and alter, damage, delete, destroy, or otherwise use the data obtained from such access. Second, Tillotson argues, the instruction did not require the jury to find she accessed a computer system in order to accomplish either of the two purposes specified in the statute.

■ Penal Code section 502, subdivision (c)(1) sets forth three elements necessary to establish guilt: (1) the defendant knowingly accesses a computer system; *and* (2) the defendant without permission alters, damages, deletes, destroys, or otherwise uses the data obtained from such access; *and* (3) the defendant alters, damages, deletes, destroys, or otherwise uses the data obtained from such access for either the purpose of devising or executing a scheme or artifice to defraud, deceive, or extort, or for the purpose of wrongfully controlling or obtaining money, property, or data. The trial court's instruction omitted the second requirement. The trial court's instruction permitted the jury to find guilt without finding Tillotson altered, damaged, deleted, destroyed, or otherwise used the data obtained from the access.

■ Because the instruction erroneously omitted an element of the crime, Tillotson did not waive her right to challenge it by failing to object or by failing to request a clarifying instruction. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

■ An instruction omitting an element of the charged offense violates a defendant's rights under the federal and state Constitutions. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277–278 [124 L.Ed.2d 182, 113 S.Ct. 2078];

---

[1] The Attorney General refers to the instruction as CALJIC No. 15.80. There is no CALJIC No. 15.80.

*People v. Cole* (2004) 33 Cal.4th 1158, 1208 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Instructional error that withdraws an element of a crime from the jury's consideration is prejudicial under state law unless "there is 'no reasonable probability that the outcome of defendant's trial would have been different had the trial court properly instructed the jury.' " (*People v. Cole, supra*, 33 Cal.4th at p. 1208.) The error is prejudicial under federal law "unless it can be shown beyond a reasonable doubt that the error did not contribute to the jury's verdict." (*Ibid.*, citing *Neder v. United States* (1999) 527 U.S. 1, 8–16 [144 L.Ed.2d 35, 119 S.Ct. 1827].)

Can it be shown beyond a reasonable doubt the instructional error did not contribute to the jury's decision to convict Tillotson on count 4? Properly instructed, the jury might have found that Tillotson did not alter, damage, delete, destroy, or otherwise use the data obtained from accessing the Equifax database on August 8, 2003. There was no evidence Tillotson altered, damaged, deleted, or destroyed such data. The MapQuest map on which Tillotson plotted the officers' addresses was dated July 18, 2003—three weeks before the Equifax reports were run. During the February 26, 2004 search, Tillotson told Detective Ellis she had not used the information in the Equifax reports. The evidence showed that Tillotson did provide the PCC with Sergeant Ramsey's address after the Equifax reports were run. The jury could conclude, however, that Tillotson used the address she obtained from peopledata.com or another Internet source rather than from the Equifax report.

Since we cannot say, beyond a reasonable doubt, a properly instructed jury would have found that Tillotson used Ramsey's address from the Equifax report, the instructional error was prejudicial.

 We decline to comment on Tillotson's proposed instruction on Penal Code section 502, subdivision (c)(1), but leave to the trial court the task on remand of drafting a new instruction. In guiding the trial court, we note, " '[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

## V.

*Under the Accusatory Pleading Test, a Violation of Penal*
*Code Section 502, Subdivision (c)(3) Is a Lesser Included*
*Offense of a Violation of Section 502, Subdivision (c)(1).*

Tillotson argues Penal Code section 502, subdivision (c)(3) creates a lesser included offense to section 502, subdivision (c)(1). She argues her conviction

on count 4 must be reversed because the trial court did not instruct the jury sua sponte on this lesser included offense. Since we reverse the conviction on count 4 and remand due to instructional error, we address this argument to provide guidance on remand.

■■■ "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Cooper* (1991) 53 Cal.3d 771, 827 [281 Cal.Rptr. 90, 809 P.2d 865].) "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073].)[2]

Penal Code section 502, subdivision (c)(1) states a person commits a public offense when that person "[k]nowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." As relevant here, Penal Code section 502, subdivision (c)(1) makes it a public offense to knowingly access and without permission use any computer, computer system, or computer network for the specified purposes.

■■■ Under Penal Code section 502, subdivision (c)(3), a person commits a public offense when that person "[k]nowingly and without permission uses or causes to be used computer services."

Penal Code section 502, subdivision (b)(4) broadly defines the term "computer services." It states: " 'Computer services' includes, but is not limited to, computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network."

Replacing the term "computer services" with its definition (in brackets, *post*) yields this version of Penal Code section 502, subdivision (c)(3):

[2] In *People v. Reed* (2006) 38 Cal.4th 1224, 1231 [45 Cal.Rptr.3d 353, 137 P.3d 184], the California Supreme Court disapproved using the accusatory pleading test in deciding whether the defendant may be convicted of multiple charged crimes. The court confirmed the accusatory pleading test should be used in determining whether to instruct on lesser included offenses: "Courts should consider the statutory elements and accusatory pleading in deciding whether a defendant received notice, and therefore may be convicted, of an *uncharged* crime . . . ." (*Ibid.*)

"Knowingly and without permission uses or causes to be used [computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network]."

Returning to Penal Code section 502, subdivision (c)(1), it states: "Knowingly accesses and without permission *alters, damages, deletes, destroys*, or otherwise *uses* any data, computer, computer system, or computer network." (Italics added.)

 It appears a person can commit a violation of Penal Code section 502, subdivision (c)(1) without also committing a violation of section 502, subdivision (c)(3) if that person "alters, damages, deletes, [or] destroys" the "data, computer, computer system, or computer network" without otherwise using any of them. (*Id.*, subd. (c)(1).) That is because, as illustrated *ante*, section 502, subdivision (c)(3) covers only "use" and does not cover alteration, damage, deletion, or destruction. In other words, if a defendant alters, damages, deletes, or destroys data, but does not otherwise use the data, the defendant could be guilty under section 502, subdivision (c)(1) but not subdivision (c)(3). Thus, it appears a violation of section 502, subdivision (c)(3) is not a lesser included offense to a violation of section 502, subdivision (c)(1) under the elements test.

But in this case, the accusatory pleading test produces a different result. Count 4 of the information, amendment 3, alleged that Tillotson "did knowingly and unlawfully access and without permission alter, damage, delete, destroy, *and* otherwise use data, a computer, a computer system, and a computer network belonging to E[quifax]." (Italics added.) By using the italicized "and" instead of "or" (as Pen. Code § 502, subd. (c)(1) does), the information alleged that Tillotson used data, a computer, a computer system, and a computer network belonging to Equifax. In other words, under the information, the prosecution had to prove *use* in addition to alteration, damage, deletion, or destruction, in order to secure a conviction. As alleged in the accusatory pleading, Tillotson could not have committed a violation of section 502, subdivision (c)(1) without also committing a violation of section 502, subdivision (c)(3). Thus, under the accusatory pleading test, in this case a violation of Penal Code section 502, subdivision (c)(3) is a lesser included offense of a violation of section 502, subdivision (c)(1).

## VI.

### *The Trial Court Could Impose the Enhancement Under Health and Safety Code Section 11370.2, Subdivision (c) Only Once.*

The jury found Tillotson guilty of two counts of possession of a controlled substance for sale (counts 1 & 24) in violation of Health and Safety Code section 11378. At sentencing, Tillotson admitted a prior felony conviction under Health and Safety Code section 11378. The trial court imposed two three-year enhancements under Health and Safety Code section 11370.2, subdivision (c) (enhancement for prior conviction).

Tillotson argues that imposing the enhancement twice (once on count 1 and once on count 24) constituted an unauthorized sentence. The Attorney General responds, "[i]t appears appellant is correct."

In *People v. Coronado* (1995) 12 Cal.4th 145, 156 [48 Cal.Rptr.2d 77, 906 P.2d 1232], the Supreme Court explained there are at least two types of sentence enhancements: "(1) those which go to the nature of the offender; and (2) those which go to the nature of the offense." Prior term enhancements fall into the first category because they are attributable to the defendant's status as a repeat offender. (*Ibid.*) The second category includes enhancements such as weapons use enhancements that arise from the circumstances of the particular crime and "typically focus on what the defendant did when the current offense was committed." (*Id.* at p. 157.)

Status enhancements are related to the offender, not to the particular counts, and therefore may be imposed only once in arriving at an aggregate sentence. (*People v. Williams* (2004) 34 Cal.4th 397, 402 [19 Cal.Rptr.3d 619, 98 P.3d 876]; *People v. Tassell* (1984) 36 Cal.3d 77, 90 [201 Cal.Rptr. 567, 679 P.2d 1], overruled on another ground in *People v. Ewoldt* (1994) 7 Cal.4th 380, 401 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

Health and Safety Code section 11370.2, subdivision (c) authorizes a sentence enhancement for a prior conviction under Health and Safety Code section 11378 for possession of certain controlled substances. The enhancement under section 11370.2, subdivision (c), as a status enhancement, could be imposed but once to aggregate Tillotson's sentence. The trial court erred by imposing the enhancement twice, so the three-year enhancement on count 24 is stricken.

## VII.

*The Trial Court Erred by Failing to State Reasons for
Imposing Consecutive Sentences on Counts 4, 5, 20,
22, and 24.*

The trial court found that Tillotson was released on bail when she committed the crimes alleged in counts 4, 5, 20, 22, and 24 and imposed a two-year sentence enhancement under Penal Code section 12022.1, subdivision (b). For purposes of the on-bail enhancement, count 1 was the primary offense (the one on which Tillotson had been released on bail) and counts 4, 5, 20, 22, and 24 were the secondary offenses. (Pen. Code, § 12022.1, subd. (a)(1), (2).) The trial court ordered the sentences on counts 4, 5, 20, 22, and 24 to run consecutively to each other "due to the fact that those crimes were committed while the defendant was out on bail, that a consecutive sentence is required by law." Tillotson argues the trial court erred by imposing the sentences on the secondary offenses consecutively to each other without stating reasons for doing so.

Penal Code section 12022.1, subdivision (e) provides: "If the person is convicted of a felony for the primary offense, is sentenced to state prison for the primary offense, and is convicted of a felony for the secondary offense, any state prison sentence for the secondary offense shall be consecutive to the primary sentence."

When a defendant is convicted of and sentenced to prison for one primary offense and for more than one secondary offense, under Penal Code section 12022.1, subdivision (e), must the sentences on the secondary offenses run consecutively to each other? Or, may the sentences run consecutively to the sentence on the primary offense but concurrent to each other? No case authority addresses this issue.[3]

We first ascertain the Legislature's intent in enacting Penal Code section 12022.1. In resolving a different issue arising out of section 12022.1, the California Supreme Court stated: "We begin by examining the words of

---

[3] The Attorney General cites *People v. Mackabee* (1989) 214 Cal.App.3d 1250 [263 Cal.Rptr. 183] as supporting its argument that Penal Code section 12022.1, subdivision (e) required consecutive sentences. That case did not concern subdivision (e) of section 12022.1. In *Mackabee*, the court held that when a defendant is found guilty on two primary offenses and multiple secondary offenses, section 12022.1 permits imposition of two two-year enhancements—one for each primary offense. (*People v. Mackabee, supra*, 214 Cal.App.3d at p. 1260.) While a two-year enhancement may be imposed on each primary offense, the *Mackabee* court held a two-year enhancement could not be imposed on each secondary offense. (*Id.* at pp. 1261–1262.)

the . . . statute[]; if the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs. [Citations.] If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such situations, we strive to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purposes. [Citation.] We will avoid any interpretation that would lead to absurd consequences. [Citation.]" (*People v. Walker* (2002) 29 Cal.4th 577, 581 [128 Cal.Rptr.2d 75, 59 P.3d 150].)

The relevant passage of Penal Code section 12022.1, subdivision (e) states, "any state prison sentence for the secondary offense shall be consecutive to the primary sentence." This passage does not indicate what must happen when there are multiple secondary offenses. This passage does not state, as the Attorney General suggests, that multiple secondary offenses must run consecutively to each other. Although not clear when applied to multiple secondary offenses, this passage taken literally suggests the prison sentence on each secondary offense must be consecutive to the prison sentence on the primary offense, and not consecutive to each other. As applied here, that would mean the sentences on counts 4, 5, 20, 22, and 24 would not run consecutively to each other, but each one would run consecutively to the sentence on count 1.

Thus, as Tillotson argues, Penal Code section 12022.1, subdivision (e) gives a trial court authority to run the sentences on multiple secondary counts concurrently to each other. Section 12022.1, subdivision (e) does not require a trial court to do so. The purposes of section 12022.1 are "to punish this particular form of recidivism," to " 'deter the commission of new felonies by persons released from custody on an earlier felony,' " and " 'to meet public concern over offenders who are arrested then allowed back on the street a short time later only to commit more crimes.' " (*People v. McClanahan* (1992) 3 Cal.4th 860, 868–869 [12 Cal.Rptr.2d 719, 838 P.2d 241].) An interpretation of section 12022.1, subdivision (e) that would require prison sentences on multiple secondary offenses to run concurrently to each other would be contrary to those purposes. Under such a reading of the statute, a defendant who commits multiple offenses while released on bail might serve the same amount of prison time as a defendant who commits only one punishable offense while on bail. We decline to interpret section 12022.1, subdivision (e) in a manner that would lead to such an "absurd consequence[]." (*People v. Walker, supra*, 29 Cal.4th at p. 581.)

We conclude that when prison sentences are imposed on multiple secondary offenses and one primary offense, Penal Code section 12022.1,

subdivision (e) requires the sentence on one secondary count to run consecutively to the sentence on the primary count. Whether the sentences on the other secondary counts are to run consecutively or concurrently to each other is a sentencing choice within the trial court's discretion. (*People v. Davis* (1995) 10 Cal.4th 463, 552 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Champion* (1995) 9 Cal.4th 879, 934 [39 Cal.Rptr.2d 547, 891 P.2d 93].) This interpretation of section 12022.1, subdivision (e) is consistent with its language and advances the Legislature's intent.

■ A trial court must expressly state reasons for its decision to impose consecutive prison terms (*People v. Jackson* (1987) 196 Cal.App.3d 380, 388 [242 Cal.Rptr. 1], disapproved on another ground in *People v. Rodriguez* (1990) 51 Cal.3d 437, 444, fn. 3 [272 Cal.Rptr. 613, 795 P.2d 783]), and the court's failure to state reasons is reversible error (*People v. Masten* (1982) 137 Cal.App.3d 579, 593 [187 Cal.Rptr. 515], disapproved on another ground in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8 [250 Cal.Rptr. 635, 758 P.2d 1165]). California Rules of Court, rule 4.425 provides the "[c]riteria affecting the decision to impose consecutive rather than concurrent sentences."

Here, the trial court's only stated reason for imposing consecutive sentences on the secondary counts was "a consecutive sentence is required by law." The trial court's failure to state reasons for imposing consecutive sentences is reviewed for harmless error. (*People v. Champion, supra*, 9 Cal.4th at p. 934.) We cannot tell, however, whether it is reasonably probable Tillotson would have not received a more favorable sentence in the absence of error (*People v. Davis, supra*, 10 Cal.4th at p. 552)—particularly in light of the fact count 4 is subject to retrial. We therefore reverse the imposition of consecutive sentences on counts 5, 20, 22, and 24 and remand for the trial court to exercise its discretion in deciding whether to impose consecutive or concurrent sentences.

VIII.

*Whether Penal Code Section 654 Required the Trial Court
to Stay Imposition of Sentence on Counts 5, 6, and 7.*

Tillotson argues the trial court erred by declining to stay imposition of sentence on counts 5, 6, and 7 under Penal Code section 654. Counts 5, 6, and 7, Tillotson argues, arose out of the same course of conduct, and had the same object, as count 4. We do not need to resolve this issue because we reverse the conviction on count 4 and remand for a retrial. We note, for the trial court's guidance, that the Attorney General concedes, "it appears counts 4, 5, 6 and 7 all involved the same objective, which was utilizing the computer to obtain the six credit reports of the named victims." As the

Attorney General explains, "[h]ad any of the four counts referred to an individual victim, separate from the victims in the other counts, then Penal Code section 654 would not have applied." The trial court should determine whether to stay imposition of sentence on counts 5, 6, and 7 in light of Penal Code section 654 and the result of any retrial on count 4.

## IX.

### Based on Black, *We Affirm the Upper Term Sentence on Count 1.*

Tillotson was convicted on count 1 of felony possession of a controlled substance for sale in violation of Health and Safety Code section 11378. The trial court sentenced Tillotson on count 1 to the upper term of three years. In reaching this sentence, the trial court found the upper term to be appropriate based on these factors: "[California] Rule[s] of Court[, rule] 4.421(a), the manner in which the crimes were carried out required great planning and sophistication. . . . [T]he . . . named victims were particularly vulnerable in that the consequences were to their personal, not their professional lives. And they may have very little recourse other than to suffer great financial hardship to get themselves out of the situation of basically a stalking defendant. [¶] As well as [California] Rule[s] of Court[, rule] 4.421(b), the defendant has numerous prior convictions; and they do increase in seriousness as time goes on." The court found no factors in mitigation.

In *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] (*Cunningham*), the United States Supreme Court held California's determinate sentencing law violates a defendant's Sixth Amendment and Fourteenth Amendment right to a jury trial to the extent it permits a trial court to impose an upper term sentence based on facts found by the court instead of found beyond a reasonable doubt by a jury. In our opinion in this case, filed on June 21, 2007, as modified July 13, 2007, we concluded: "Because the trial court here imposed the upper term sentence on count 1 based on several aggravating factors that were not found true beyond a reasonable doubt by a jury, and the error was not harmless, we remand for resentencing in light of *Cunningham* . . . ."

On October 17, 2007, the California Supreme Court granted the Attorney General's petition for review (S155385) and transferred this case to us with directions to vacate the decision and reconsider the cause in light of *Black*. The parties submitted supplemental briefs pursuant to California Rules of Court, rule 8.200(b)(1), and the matter was submitted on November 21, 2007. After considering the supplemental briefs, we conclude the trial court's sentencing decision on count 1 was proper.

In *Black*, the California Supreme Court held: "*Cunningham* requires us to recognize that aggravating circumstances serve two analytically distinct functions in California's current determinate sentencing scheme. One function is to raise the maximum permissible sentence from the middle term to the upper term. The other function is to serve as a consideration in the trial court's exercise of its discretion in selecting the appropriate term from among those authorized for the defendant's offense. Although the DSL [determinate sentencing law] does not distinguish between these two functions, in light of *Cunningham* it is now clear that we must view the federal Constitution as treating them differently. Federal constitutional principles provide a criminal defendant the right to a jury trial and require the prosecution to prove its case beyond a reasonable doubt as to factual determinations (other than prior convictions) that serve the first function, but leave the trial court free to make factual determinations that serve the second function. It follows that imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Black, supra*, 41 Cal.4th at pp. 815–816.)

Here, the trial court imposed the upper term sentence on count 1 based on findings that the crimes were carried out in a manner that indicated planning, sophistication, or professionalism (Cal. Rules of Court, rule 4.421(a)(8)), that the victims were particularly vulnerable (*id.*, rule 4.421(a)(3)), and that Tillotson had numerous prior convictions of increasing seriousness (*id.*, rule 4.421(b)(2)). The last factor, Tillotson's record of prior convictions, was not subject to a jury trial under *Cunningham*, and alone was sufficient under *Black* to support the upper term sentence on count 1.[4] Under *Black*, Tillotson was not entitled to the middle term sentence, and imposition of the upper term sentence on count 1 did not violate her Sixth Amendment right to a jury trial. (*Black, supra*, 41 Cal.4th at p. 820.)

DISPOSITION

The judgment is affirmed in all respects except as follows.

1. The trial court is directed to modify the judgment as to count 23 to reflect a conviction for an attempted violation of Penal Code section 166, subdivision (a)(4). As modified, the judgment as to count 23 is affirmed except as to sentencing. The matter is remanded for resentencing on count 23.

---

[4] In *People v. Sandoval* (2007) 41 Cal.4th 825, 837 [62 Cal.Rptr.3d 588, 161 P.3d 1146], the court confirmed that the victim's vulnerability and evidence of planning and premeditation were sentencing factors that had to be determined by a jury.

2. The judgment as to count 4 is reversed and the matter remanded for a new trial.

3. The three-year enhancement pursuant to Health and Safety Code section 11370.2, subdivision (c) is stricken on count 24.

4. The matter is remanded on counts 5, 20, 22, and 24 for a determination and findings on whether the sentences on those counts are to run consecutively to each other or consecutively to the sentence on count 1 but concurrent to each other.

Moore, Acting P. J., and Aronson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 13, 2008, S159623.