Filed 6/26/13  P. v. Sanchez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROLANDO SANCHEZ<br>and LUIS BARBA,<br><br>    Defendants and Appellants. | B233355<br><br>(Los Angeles County<br>Super. Ct. No. NA085545) |

APPEALS from judgments of the Superior Court of Los Angeles County.  John David Lord, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant Sanchez.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Barba.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Zee Rodriguez and Roberta L. Davis, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendants Rolando Sanchez and Luis Barba appeal from the judgments entered following a joint trial with separate juries in which each was convicted of first degree murder and Barba was found to have personally used a deadly and dangerous weapon. Barba contends the trial court committed instructional error and his trial attorney rendered ineffective assistance by failing to request a particular instruction. Sanchez contends his trial attorney rendered ineffective assistance by failing to seek exclusion of certain evidence and failing to object to various matters. We affirm.

## BACKGROUND

**Evidence presented to both juries**

Sanchez lived in half of a converted garage behind the Wilmington home shared by his older brother Jaime, Barba's mother Victoria Haro, and Barba's brother Jose. Gonzalo Valenzuela lived in the other half of the converted garage. Sanchez and Valenzuela were friends, and both were gay. In March of 2010, Barba and a friend of the family named Vicente (known as Chupacabra) were also staying in the main house. (Undesignated dates pertain to 2010.) Barba called Sanchez "uncle."

Around the end of January, Jose asked about cuts he saw on Valenzuela's wrist, but Valenzuela refused to talk about it. Jose then asked Sanchez, who said Valenzuela had "'tried to hurt himself because I told him that I didn't love him. He said that he loved me, and I told him that there was no love there.'" Sanchez once told Jose that Valenzuela was always falling in love with Sanchez. Jose once saw Valenzuela and Sanchez arguing about the same topic.

About 1:30 or 2:00 a.m. on March 31, Barba twice phoned his friend Alberto Banuelos and asked Banuelos to pick him up at the house. Banuelos agreed and borrowed his brother's Ford Explorer. Barba told Banuelos to park in the alley alongside the house. When Banuelos arrived, Barba and Sanchez emerged from the garage and Barba thanked him for coming. Barba and Sanchez went back inside the garage, and Banuelos followed them to the door. He saw a body lying on the floor, wrapped in a blanket. Barba said, "'We need to get rid of the body.'" Barba subsequently said, "'He's

still breathing.'" Barba and Sanchez looked around the garage and found some sturdy string. One of them tied the string around the body's head, then both of them forcefully pulled on the string from opposite sides of the body for 30 to 45 seconds. Sanchez said, "'He's already dead. Let's just go. We need to get him out of here.'" Barba and Sanchez then carried the body to the alley and loaded it into the Explorer. Banuelos said he did not want to be involved, and Barba told him not to worry because he would not have to do anything. Banuelos said he did not want to get blood in the car. Barba said there was no blood because Sanchez "'had choked him out.'"

Barba got into the driver's seat and Banuelos got into the front passenger seat. Sanchez left for awhile, then got into the back seat with a gasoline can. Banuelos thought Barba was a little drunk, but sober enough to drive. Sanchez and Barba said they needed to get gasoline. Barba parked a block away from a gas station and told Sanchez to walk so that the gas station's security cameras would not depict their vehicle. Sanchez walked to the station with the gas can and returned after about five minutes. During Sanchez's absence, Barba thanked Banuelos again and said that he did not know what he would have done if Banuelos had not shown up. After Sanchez returned, Barba drove on two freeways, then exited and made numerous turns on surface streets. Barba said he knew where he was going. Sanchez began acting "paranoid" when they got off the freeway. He said that a police car was following them and that he wanted to get rid of the body as soon as possible. Barba turned into an alley and stopped.

Barba and Sanchez removed the body and placed it on the ground behind the Explorer. Banuelos remained seated in the vehicle, but looked behind him and saw Sanchez pouring gasoline on the body. Banuelos looked away, but then saw flames in the rearview mirror. After Barba and Sanchez got back in the car, Barba asked about the gas can. Sanchez said, "'Don't worry, it's going to melt with everything.'" Barba drove away, taking numerous turns on surface streets. He suggested that they stop to get something to eat. Sanchez agreed. Barba went through a drive-through and he and Sanchez ordered food. Banuelos saw Barba, but not Sanchez, eat. As Barba drove back

3

to his family's house, he told Banuelos that if anyone asked, Banuelos should say he picked up Barba and they went to bars in Los Angeles. Sanchez said he would say that some other person picked him up and took him out. When they arrived at the house, Barba and Sanchez got out, and Banuelos drove home.

Banuelos testified that it appeared that Barba and Sanchez were equal participants and no one was "calling the shots," threatening the other, or forcing the other to do anything. Banuelos did not see anyone with a gun or any other weapons (apart from the string) or see a gun in the Explorer. Although no one threatened Banuelos, he felt that if he did not comply, Barba and Sanchez might kill him.

The burning body was discovered along a street across from Compton High School about 2:10 a.m. on March 31. It was eventually identified as Valenzuela. Numerous charred document fragments, a notebook, jewelry, and other objects were on and around Valenzuela's body. He was missing one shoe and there was burnt corded material on the back of his head.

An autopsy revealed that Valenzuela had been strangled and was dead before his body was burned. Bruises on his forehead, both sides of his head, and inside his mouth were necessarily inflicted before death. The deputy medical examiner saw no indication that Valenzuela was strangled twice, but a second ligature applied to his neck after death, would not have caused any additional damage.

Rosa Valenzuela Sotelo went to the Barba-Sanchez house twice in April, looking for her brother, Valenzuela. Sanchez told her that Valenzuela had left and Sanchez thought he had gone to Arizona with his boyfriend.

Barba phoned Banuelos at the end of April and told him they had to flee because Sanchez had been arrested. They went to stay with Barba's relatives in Guadalajara. On the way there, they agreed that if they were questioned by the police they would say that Sanchez was calling the shots and threatened them, they feared Sanchez would practice witchcraft on them, and Barba was drunk and high on the night of the murder. Banuelos returned to the United States after about a month.

4

The police went to Banuelos's home sometime in July. Banuelos initially told them the story he and Barba had devised on their way to Guadalajara, but later told them the truth, although he did not say he saw Sanchez and Barba pull the string around Valenzuela's neck.

**Evidence presented only to Barba's jury**

Barba eventually phoned Los Angeles Sheriff's Detective Gary Sica from Mexico and voluntarily returned to California. Sica interviewed Barba and a recording of that interview was played at trial in the presence of Barba's jury only. Barba said that he viewed Sanchez as an uncle, but did not socialize with Sanchez, who was "on a different planet." Barba also feared Sanchez, who practiced witchcraft and voodoo. Sanchez also became a different, highly argumentative person when he smoked methamphetamine. Barba and Sanchez had argued on more than one occasion.

Barba told Sica that Valenzuela was "real cool" and "real nice." Valenzuela always helped the family with laundry and shopping. Valenzuela also smoked methamphetamine, but it did not change his behavior. Barba heard Sanchez and Valenzuela arguing a few weeks before Valenzuela was killed.

Barba said he drank brandy and used cocaine. He angered easily when drunk. Cocaine calmed him, but it also made him nervous and paranoid. Barba was drunk and had used cocaine on the night Valenzuela was killed.

Barba told Sica he went out on the back patio to smoke about 1:00 a.m., then stepped into the garage to visit with Sanchez and Valenzuela. Barba saw Valenzuela facedown and motionless on the ground. Barba asked what happened. Sanchez replied, "[I]f I didn't do it, they were going to do it to me." Barba told Sanchez to move the body to prevent Barba's mother, who was an undocumented immigrant, from getting in trouble. Barba phoned Banuelos and asked him to come over, without stating a reason.

Sanchez wrapped Valenzuela's body in a blanket and Barba helped him carry the body out of the garage. When Banuelos arrived, Sanchez told Banuelos he could not leave because he had already seen too much. Barba and Sanchez put Valenzuela's body

5

in Banuelos's car. Sanchez grabbed Valenzuela's books and papers and threw them in the car with the body. He also brought a gas can. Sanchez insisted that Barba drive and directed him to stop at a gas station. Barba parked short of the station, saying he did not want to be involved. Sanchez walked to fill the gas can.

While Sanchez was gone, Barba and Banuelos discussed calling the police, but feared they would be charged. After Sanchez returned, Barba got onto the freeway and Sanchez told him where to exit. Barba did not know where he was going and just turned on various streets until Sanchez told him to stop. Sanchez got out, dragged the body out of the car, put the papers and things on top of it, poured gas on it, and set it on fire. Barba initially denied assisting Sanchez, but later admitted he helped remove the body from the car. Barba "tripped out" and they left. Sanchez told Banuelos not to say anything and told Barba to say he had not seen Valenzuela since Sunday. Sanchez wanted hamburgers, so they went to a Jack-in-the-Box before returning home. Sanchez ordered all of the food, and both he and Barba ate it.

Barba told Sica he did not ask Sanchez why he killed Valenzuela because he feared Sanchez would use witchcraft or voodoo on him. Barba never saw anything wrapped around Valenzuela's neck and did not know that Valenzuela was strangled until Sanchez mentioned it the next day.

After Sica confronted Barba, Barba admitted that he and Sanchez had both strangled Valenzuela with a dog leash. Barba explained that Sanchez, who was skilled at "brainwashing" and manipulating people, "kept telling" him that Valenzuela was "going to hurt [Barba's] mom." Sanchez had been saying the same thing for weeks or months. Every time Barba would get drunk, Sanchez would say the same thing. On the night of the murder, Barba had consumed a large bottle of brandy and was drunk and "fucked up in [his] head." When Barba walked into the garage, Sanchez was next to Valenzuela. Both Barba and Sanchez grabbed Valenzuela, and Sanchez put the dog leash around Valenzuela's neck and pulled it tight. Barba held Valenzuela down on the bed while

6

Sanchez pulled on the leash until Valenzuela stopped breathing. Barba dragged Valenzuela's body by the leash to the door between the two rooms in the garage.

After Banuelos arrived, Sanchez said, "He's alive," and Barba asked, "He's still breathing?" Barba did not remember who grabbed some clothesline and wrapped it around Valenzuela's neck, but both he and Sanchez pulled on the line from opposite sides. They carried the body from inside the garage to the car, but never left it in the yard. Sanchez brought the gas can on his own.

Barba did not testify or present any witnesses.

**Evidence presented only to Sanchez's jury**

Haro (Barba's mother) testified she felt no animosity toward Valenzuela and did not blame him for losing her job. She stopped working because she lost her eyesight. Valenzuela "helped [her] more than [her] children" and "was very good" to her. On April 28, Haro heard Jaime ask Sanchez whether he had killed Valenzuela. Jaime was angry and said he would call the police. Haro told Sanchez not to involve her children. Sanchez responded, "'No. You know that I'm going to take three or four with me.'" Sanchez continued, "I'm going to take them between my legs." Haro phoned Barba, informed him that Sanchez had accused him of killing Valenzuela, and asked if this was true. Barba replied, "'Mom, I just want you to know that I love you very much. Don't forget that.'"

Investigators from the Los Angeles Police Department (LAPD) and the Sheriff's Department interviewed Sanchez six times during April. The first interview was not recorded, but the other five were, and the recordings were played for Sanchez's jury.

LAPD Detective Edward Yoon and Officer Fernando Rivas conducted the unrecorded interview on April 3 in the immediate wake of the murder of Robert Garcia Gudino (known as Carlos), who was a close friend and frequent companion of Sanchez and Valenzuela. Sanchez was in the car with Carlos when shots were fired from a second car, striking Carlos. Yoon and Rivas interviewed Sanchez again on April 15 and videotaped that interview. Sanchez said Valenzuela had not been at the house since

7

around March 28 or 29, when Valenzuela argued with, and threatened to kill Carlos. Sanchez had heard Valenzuela had gone to Arizona to help his boyfriend Moises. Sanchez said, "I don't want to say it, but I think [Valenzuela] and Moises, I think they something [*sic*] to do with it." While recounting the April 3 shooting, Sanchez said he did not see the faces of any of the people in the car from which shots were fired, then said, "I was trying to get at least the license plate, the four because you guys know what I've been in jail. I mean, I've been in jail for, um, five times, and I know the last four, you know, even from the last . . . that helps a lot."

The second recorded interview was on April 28, after someone at the Barba-Sanchez home called the police to report a murder. Sanchez told LAPD Sergeant Ernie Jones that Barba killed Sanchez's "best friend," Valenzuela. Sanchez stated that about 10:00 p.m., Barba brought him outside and they walked down the alley. Barba asked Sanchez what he thought about Valenzuela. Sanchez asked Barba why he was asking. Barba said, "[W]ell, he's going to be gone tonight." Sanchez asked Barba, "What did he do, like, for you to disappear him?" Barba said Valenzuela had gotten into too many problems with Haro. Barba asked Sanchez to take Chupacabra into the living room "until I do my thing." Sanchez complied. While they were in the living room, Sanchez and Chupacabra discussed what Barba was going to do. Sanchez said, "I hope he's not going to do what I'm thinking, but I think he's going to kill [Valenzuela]." After about 10 minutes, Barba called out to Sanchez to come outside. Sanchez complied and saw Barba strangling Valenzuela with a dog leash. Valenzuela was on the floor beside his bed and appeared to be dead. Barba said he wanted Sanchez to be involved in the crime and to see that Barba was also capable of killing Sanchez's family if Sanchez reported the crime.

Sanchez told Jones that Barba called numerous people to get a car, and finally Banuelos came over. At Barba's direction, Sanchez wrapped Valenzuela's body in a blanket. Valenzuela started "breathing . . . a little." Barba told Sanchez to cut off a piece of the clothesline. Sanchez complied. Barba wrapped the rope from the clothesline

8

around Valenzuela's neck three times, put his foot on Valenzuela's neck, and pulled on the rope. Barba told Sanchez to grab one end of the rope and pull. Sanchez held one end of the rope, but did not pull it. Barba touched Valenzuela to make sure he was no longer breathing. Barba, Sanchez, and Banuelos loaded the body into Banuelos's car. Barba "made" Sanchez put gasoline in a container they brought with them and pour it on Valenzuela's body. Barba lit the fire. They discarded the leash and one of Valenzuela's shoes in a trash bin.

Sanchez told Jones that sometime in the three days prior to the interview he had seen Barba and asked why he had killed Valenzuela. Barba said, "[B]ecause he got into it with my mom's problems. And—and he was talking . . . shit about my mom." Barba would not tell Sanchez what Valenzuela had said, but warned him not to say anything "because you know already what's going to happen." Sanchez thought that Carlos had somehow found out about Valenzuela's murder, and Carlos was killed because Barba "wanted us, Carlos and me to disappear because we knew."

The third recorded interview occurred later on April 28 and was conducted by Rivas and Yoon. Sanchez's statements were generally consistent with those in the second recorded interview, but he stated that in the alley Barba said, "'I'm going to kill him.'" Sanchez said Barba was joking, and Barba said, "'No, tio, for reals.'" Sanchez said that when he went outside after Barba called to him, Barba was outside of the garage, shirtless and barefoot. At that time, Barba made a phone call to one of his friends in Fresno and said that his friend had "'the rights to kill [Sanchez's] family'" if anything happened to Barba or Sanchez told anyone. Barba then told Sanchez that his friend was "already on the floor." Sanchez ran into the garage and saw Valenzuela facedown on the floor next to his bed with a rope around his neck. Sanchez later clarified that the "rope" was a dog leash. Barba pulled Valenzuela's body out onto the patio using the leash. Sanchez claimed he did not know if Valenzuela actually started breathing again, and said the strangulation with clothesline occurred before Banuelos arrived. He further said that all three men wrapped the body in a blanket.

9

Also in the third recorded interview, Sanchez said for the first time that Barba had a gun with him. He initially said he thought about running away when Barba told him to go put gasoline in the can, but he saw Barba following him with a gun. Later in the interview, Sanchez said he saw Barba hand his gun to Banuelos when they first got in the car, and thereafter Barba repeatedly reached into the door pocket next to him for his gun. Sanchez also told the officers that Barba taunted him while they were in the car, telling him to hug and kiss Valenzuela. While they were driving in an alley, a police car shone a spotlight on their car, but did not stop them. Sanchez also said that the day before the interview, he had asked Barba why he "did it," and Barba told him Valenzuela had gotten Haro in trouble regarding missing items at her workplace.

The fourth recorded interview occurred still later on April 28 and lasted until the early morning hours of April 29. Sheriff's Sergeant Michael Rodriguez took Sanchez back to the Barba-Sanchez house and videotaped Sanchez recounting how and where Valenzuela was murdered. Sanchez stated for the first time that he went into the garage and saw Barba place a rope around Valenzuela's neck. Sanchez ran back to the main house.

On April 30 Sica and Rodriguez conducted the fifth recorded interview. Sanchez told them he had known Valenzuela for 13 years and described their relationship as "perfect." Valenzuela had a crush on Sanchez, but they were not lovers. They would "have sex with all the guys, like together." Valenzuela was always jealous. Sanchez said that about a week before the murder, Barba had said that Valenzuela was saying bad things about Haro, and Haro accused Valenzuela of getting her fired by saying she had stolen items.

Sanchez told the detectives that on the night of the murder he, Valenzuela, and Carlos were smoking methamphetamine in the garage. Carlos left around 9:20 or 9:30 p.m., then Valenzuela went to bed. Sanchez went into the main house to Barba's room. Barba was on the phone and there was a bottle of Hennessy and some cocaine next to him. Barba said, "'Hey, homie. Uh, so, I have my uncle right here and I'm just going to

10

let him know right now what is going to happen.'" Barba told Sanchez to have a drink. Barba then said, "'Hey, homie, okay, remember I told you already the addresses and everything in case my uncle opens his mouth for the actions I'm going to do?'" Barba then told his friend he would call him right back because he was going to "'tell my uncle what am I going to do now, because I'm going to do it right now because I have to do it right now.'" Barba told Sanchez to bring his drink and come outside. As they walked down the alley, Barba told Sanchez that Valenzuela was "'going to be disappeared tonight.'" Sanchez asked Barba what he was going to do, and Barba said, "'This is nothing for me, I done this before, and I'm just going to do it and I have to do it today.'" Barba also said, "'This isn't the first time, Uncle, so trust me, everything is going to be okay.'" Sanchez said Barba had admitted killing a friend in Fresno about seven years earlier and Sanchez heard Barba had fired shots into the car of a friend in Wilmington four years earlier. Sanchez said Barba also used his gun to commit robberies.

Sanchez told Sica and Rodriguez he kept Chupacabra in the living room for about 15 minutes before Barba called him to come outside. When Sanchez got out to the garage, Barba said, "'Hurry up, . . . I want you to see this.'" Barba pushed Sanchez toward Valenzuela's room and said, "'Just go in and look—and look at it.'" Sanchez then saw Valenzuela lying facedown next to his bed with the leash around his neck. Barba asked Sanchez to help drag the body out, but Sanchez said he would stand watch and keep Chupacabra from approaching. As Barba dragged the body out, he began beating Valenzuela's face and saying, "'Fuck you, motherfucker. This is what happens to the people that are causing, uh, my mom problems or my family problems.'" Barba already had the gun with him at that time. When Barba called friends seeking a ride, he told them, "'I have a body that has to disappear.'" Before Banuelos arrived, Barba said Valenzuela was still breathing and told Sanchez to go get a knife from the kitchen and cut a rope from the clothesline. Sanchez complied, and Barba looped the rope around Valenzuela's neck twice. A third loop went through the mouth. Barba put his foot on Valenzuela's back and pulled up on the rope six times before handing Sanchez one end,

11

wrapping it around Sanchez's hand and telling him to "'pull so you can feel what it feels like killing somebody.'" Sanchez held it while Barba pulled. The body was stiff.

Sanchez told the detectives Barba and Banuelos wrapped Valenzuela's body in a blanket and put it in the truck. Barba went back to get the gas can. Sanchez wanted to stay home, but Barba touched the gun in his waistband and said, "'No, you're going with me, you're not staying here.'" Sanchez thought Barba would pull the gun and shoot him before he got to the kitchen. When they reached a gas station, Barba said he did not want to drive in because it had cameras. Barba gave Sanchez money and told him to go fill the gasoline can. Sanchez looked back when he reached a corner to see whether Barba was following him, but he was not. (Later in the interview, Sanchez said he saw Barba following him.) When Sanchez returned, he saw Barba getting in the truck and concluded Barba must have been following him.

Sanchez told Sica and Rodriguez that as they drove, Barba repeatedly reached toward the door pocket where he had put his gun and told Sanchez, "'Rolando, go in the back with your friend—with your homie and touch on his pulse, tell me if he's breathing or go and smack him or go and tell him, "Hey, you're fucked up," or just go and do whatever you want.'" Sanchez thought Barba was just trying to get him into the back of the truck to kill him. Sanchez said that when they passed the police car in an alley, Barba said, "'I don't give a fuck, I have this.' That's when I find out for real that he had the gun, and I'm afraid he's likely to do something to me." After they parked, Barba pulled the body out and piled Valenzuela's notebooks, papers, and clothing on top of the body, which was faceup. Barba told Sanchez to get out and bring the gas can, then told him to pour the gasoline on top of the body. Barba said Sanchez was pouring too slowly, so he grabbed the gas can and dumped the gasoline on the body, then put the can on top of the body and lit the fire.

Sanchez told the officers that he had two prior arrests, which were for driving a car without a license and possession of methamphetamine. He said he had been ordered to be deported to Mexico and was "supposed to show up to Immigration today." Sanchez

denied that he had ever had Valenzuela beaten. Sica said that several people had told him Sanchez may have had Valenzuela or Carlos beaten. Sanchez also said Barba was not gay.

At trial Sanchez testified that he had known Valenzuela for 14 years. Valenzuela often stayed with Sanchez and moved in with him in 2010. They were both gay and liked to dress in women's clothing and wigs at night. They sometimes argued over clothing and wigs, and they argued all the time about Valenzuela's feelings for Sanchez, although Valenzuela was not in love with Sanchez and they had never had a romantic or sexual relationship with each other.

Sanchez further testified that Barba moved back in with his family in 2010 because he had hit his girlfriend and she had obtained a restraining order against him. Barba was bossy and got upset easily. He told Sanchez he had killed someone in Fresno, but Sanchez did not believe him. Barba drank and used drugs with Valenzuela, Sanchez, and Carlos. Sanchez believed Barba was bisexual. The week before Valenzuela died, Sanchez saw Barba and Valenzuela engaging in oral copulation in the garage. Sanchez explained that the incident did not occur to him when he told the police Barba was straight. Methamphetamine caused Sanchez to become panicky, draw on walls, and clean.

Sanchez testified that after he went to bed on the night that Valenzuela died, Barba came into his room in the garage and told him to come inside the main house. When Sanchez went into Barba's room, there was a gun next to the bed and four lines of cocaine were alongside the alcohol bottle. Barba was on the phone and told the person to whom he was speaking that he was about to confide something to his uncle, then stated the address of Sanchez's sister, referred to having provided other addresses, and said, "'Just in case if he opens his mouth regarding what I'm going to do tonight.'" Barba told Sanchez to have a drink and some cocaine. Sanchez had a drink; Barba used all of the cocaine himself. Barba placed the gun in his waistband and asked Sanchez to go outside, saying he could not talk inside. As they walked down the alley Barba hugged Sanchez

13

and asked him how much he loved Valenzuela. Sanchez said Valenzuela was like a sister to him. Barba said, "'Well, it's just that tonight he's going to disappear.'" Sanchez asked for clarification, and Barba said, "'Well, I'm going to kill him.'" Sanchez asked why, but Barba did not answer. Sanchez did not believe Barba would actually kill Valenzuela. Barba asked Sanchez to take Chupacabra inside the house and keep him there, so Sanchez did so. Sanchez told Chupacabra what Barba had said, but Chupacabra said Sanchez was imagining things and should stop taking drugs.

Sanchez testified he crept out to the garage to see what was happening and saw Barba standing behind Valenzuela with a rope. Barba put the rope around Valenzuela's neck and pulled him to the ground, striking Valenzuela's head on the ground. Sanchez ran back inside the main house and told Chupacabra what he had seen, but Chupacabra did not believe him. Sanchez thought Barba would believe Sanchez was summoning help and would not go through with killing Valenzuela.

Sanchez testified Barba called him to the garage about 15 minutes later. When Sanchez entered the garage, he saw Valenzuela lying facedown with a dog leash around him. Sanchez took a photograph of Valenzuela with his mobile phone while Barba changed clothes. Barba asked Sanchez to help him move Valenzuela's body, but Sanchez refused, even though he feared Barba was going to kill him too. Barba pulled Valenzuela's body by the leash, repeatedly lifting his head off the ground about a foot, then letting go, causing the head to strike the ground. Barba said, "'This is what happens to people that get in trouble with my mom.'" Valenzuela's body was rigid. When Barba got the body out of the garage, he called his friend and said he had done what he intended. Barba then called about seven other friends asking them for a "'very big favor'" without further details. After Banuelos arrived, Barba said Valenzuela was still breathing. Sanchez leaned down near Valenzuela's head and saw that he was not breathing. Barba pushed Sanchez away and checked Valenzuela's pulse. Sanchez initially demonstrated at trial that Barba placed both hands around Valenzuela's neck as if to choke him, but on cross-examination he said Barba had only placed two fingers on

14

Valenzuela's neck. Barba told Sanchez to get a knife and cut a piece of clothesline. Sanchez did so because he feared Barba.

Sanchez's testimonial description of the second strangulation was essentially the same as in his fifth recorded statement to the police, except he testified that Barba told him to pull on the rope on the count of three. Sanchez testified that on the count of three he let go of his end of the rope. Barba wrapped the ends of the rope around his own hands, put his foot on Valenzuela's head, and pulled for 10 to 15 seconds, saying, "'This is how you should have pulled.'" Barba told Sanchez to get a blanket, and Barba and Sanchez wrapped Valenzuela's body in the blanket. Barba and Sanchez carried the body to Banuelos's truck, but Barba and Banuelos loaded it. Barba told Sanchez he had to come with them. Sanchez went into the yard and closed the gate. Barba got out of the vehicle, pointed his gun at Sanchez and said that if Sanchez ran, he would not make it to the kitchen. Sanchez got in the car, then Barba told him to go get the gas can. Sanchez complied. During the drive, Barba taunted Sanchez by telling him to hug and kiss Valenzuela and saying, "'Oh, can't you hear? He's talking to you. He's telling you that he loves you a lot.'" Sanchez moved into the middle of the backseat because he thought Barba and Banuelos were planning to kill him. Every time Barba and Banuelos spoke to one another, they turned up the volume on the radio so Sanchez could not hear them.

Sanchez testified that when he was walking to the gas station, he bent down and looked back and saw that Barba was following about 20 feet behind him, holding the gun. Sanchez's testimonial account of burning the body was almost the same as in his fifth recorded statement, except he testified he initially refused Barba's order to bring the gas can from the car. Sanchez also testified he could not tell whether Valenzuela's body was faceup or facedown. After getting back in the truck, he took another photograph with his mobile phone, but someone must have deleted it. Sanchez's testimony regarding the drive back to the family house was essentially the same as in his fifth recorded statement, except he added that Barba told him to develop an alibi for himself. Back at

15

the house, Barba unwrapped his hamburger and said, "'I think this is what your friend looks like now.'"

Sanchez testified Barba moved out after the murder, but visited his family four times. Each time, Sanchez asked him why he killed Valenzuela, but Barba just told Sanchez to use a lot of methamphetamine and forget about it. Sanchez complied. He testified he was either under the influence of, or had methamphetamine in his system during each of his police interviews. He denied implicating Valenzuela in Carlos's murder and claimed the police misunderstood him. Sanchez admitted, apparently in reference to his pretrial statements, "I did lie on some things."

Barba's brother Jose testified that Barba was not a violent person and he had never seen Barba with a gun.

Defense expert forensic pathologist Dr. Harry James Bonnell agreed with the cause of death, but testified that a postmortem application of a ligature would result in visible damage because blood would drain into the compressed tissue. He saw only one area of bruising on Valenzuela's neck, and thus found no indication of a second strangulation, either pre- or postmortem. He opined that the marks in the autopsy photographs were more consistent with the use of a dog collar or leash as a ligature than with the use of a rope. Bonnell further testified bruises can be inflicted postmortem, and thus the bruising on Valenzuela's head may have been postmortem. Valenzuela had methamphetamine in his system at the time of death. Bonnell testified methamphetamine can cause the arteries around the heart to spasm, making heart arrhythmia more likely. Bonnell admitted he had been fired from his former job as Chief Deputy Medical Examiner for San Diego County.

Sica testified in rebuttal that Sanchez did not appear to be under the influence of a controlled substance at the time of the fifth recorded interview. During that interview, Sanchez had shown Sica a completely black photograph on his mobile phone that he claimed was the photograph of Valenzuela's body taken before they transported it. The phone indicated that the photograph was taken about 18 hours after the approximate time

16

of the murder.  Sanchez said nothing about a second photograph.  Sica further testified that rigor mortis does not begin until 8 to 10 hours after death.

**Verdicts and sentencing**

Barba's jury convicted him of first degree murder and found true an allegation that he had personally used a deadly weapon in the commission of the murder.  The trial court sentenced him to 25 years to life for murder plus 1 year for the weapon use.

Sanchez's jury convicted him of first degree murder but found the personal weapon-use allegation not true.  The court sentenced him to 25 years to life.

## DISCUSSION

**1.      Barba:  Failure to instruct sua sponte on unreasonable defense of others**

Barba's jury was instructed upon voluntary manslaughter using a modified version of CALJIC No. 8.40, without reference to sudden quarrel or heat of passion and unreasonable self-defense or defense of others.  Barba contends the trial court erred by failing to instruct sua sponte on unreasonable defense of others as a theory supporting a voluntary manslaughter verdict.  He bases his claim on his statement to detectives in which he said that every time he got drunk, including the night of the murder, Sanchez told him Valenzuela was "going to hurt" Haro.

Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and necessary for the jury's understanding of the case.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)  It must instruct on every theory of the case supported by substantial evidence, that is, evidence sufficient for a reasonable jury to find in favor of the defendant.  (*People v. Young* (2005) 34 Cal.4th 1149, 1200; *People v. Salas* (2006) 37 Cal.4th 967, 982.)

One who kills another person because he or she actually, but unreasonably, believed in the need to defend another person from imminent death or great bodily injury is deemed to have acted without malice, and thus commits manslaughter, not murder. (*People v. Randle* (2005) 35 Cal.4th 987, 996–997, disapproved on another ground in

17

*People v. Chun* (2009) 45 Cal.4th 1177, 1201.)

Neither Barba's statement nor any other evidence in the record supported a theory of unreasonable defense of others. Barba told the police that for weeks or months, every time Barba got drunk, Sanchez had been saying Valenzuela was going "to hurt" Barba's mother. The repetitious statements alone detracted from the imminence of any possible risk of harm, given that Barba's mother was not apparently harmed on any of the earlier occasions when Sanchez made these statements to Barba. On the night of the actual murder, nothing in the record indicates that Valenzuela was near Haro or behaving in a manner that would cause Barba to believe that Valenzuela posed a risk of imminent death or great bodily injury. Valenzuela was not, for example, aiming a rifle at Haro's bedroom window. Valenzuela was killed in the garage, and nothing indicated that Haro was present in the garage at that time. In addition, nothing in the record indicates that Barba understood "hurt" to mean inflicting death or great bodily injury, as opposed to slapping Haro, tripping her, or hurting her feelings, business, or immigration status. Finally, although Barba attempted to explain his behavior as being induced by Sanchez's statements, nothing in the record shows that he *actually believed* he had to kill Valenzuela to prevent imminent death or great bodily injury to Haro. Accordingly, substantial evidence did not support instruction upon unreasonable defense of others, and the trial court did not err by failing to instruct on this theory.

Barba further contends his trial attorney rendered ineffective assistance by failing to request instruction upon unreasonable defense of others. A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561 (*Jones*).) Because substantial evidence did not support this instruction, counsel did not err by failing to request it.

Barba also contends his trial counsel rendered ineffective assistance by failing to request that the trial court instruct upon unreasonable self-defense. Because nothing in

18

the record indicated that Barba actually believed that Valenzuela posed a risk of imminent death or great bodily injury to him or suggested a basis upon which he could have held such a belief, counsel did not err by failing to request such an instruction.

**2.     Barba:  Failure to instruct sua sponte upon unanimity**

Barba contends the trial court was required to instruct, sua sponte, upon unanimity because some jurors may have believed he "killed Valenzuela in the bedroom by holding him down while [Sanchez] strangled him," and others may have believed he "killed Valenzuela in the garage by pulling on the clothesline while [Sanchez] pulled on the other end."

A trial court must instruct jurors that they must unanimously agree that defendant committed the same specific criminal act "'"when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.'  [Citation.]  In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.)

No unanimity instruction was required.  The two differing scenarios to which Barba refers in his contention are merely theories of Barba's liability for murder (aider and abettor or direct perpetrator) involving multiple acts toward the commission of the single discrete crime of murder.  There were not multiple murders that could have formed the basis of the sole murder charge.  Even if some jurors believed Valenzuela died during the first strangulation, while others believed he died during the second, such differing views of the case would not violate Barba's right to a unanimous verdict.

19

**3.       Sanchez:  ineffective assistance of trial counsel**

**a.       Failure to seek exclusion of Sanchez's references to arrests and being in jail**

Sanchez contends that his trial attorney rendered ineffective assistance by failing to request redaction to eliminate Sanchez's statements in the first recorded interview that he had been in jail five times and his statement in the fifth recorded interview that he had prior arrests for driving without a license and possession of methamphetamine.

When the court and counsel initially addressed the first recorded interview, Sanchez's attorney said she did not think she had a transcript of the interview and the interview was "new information to [her]."  The court ordered the prosecutor to "turn over" "any statements that you have."  After the noon recess, Sanchez's attorney sought unsuccessfully to exclude the entire interview on the ground it was irrelevant and more prejudicial than probative.  She expressly referred to Sanchez's statement attempting to implicate Valenzuela in Carlos's murder.

The next day, the prosecutor informed the court and defense counsel that a transcript of the first recorded interview was being prepared.  Sanchez's attorney reiterated her objections to introducing that interview.  She then informed the court that only the first five minutes of the interview dealt with the matter the prosecutor wanted to introduce; after that portion, "there was this big gap of silence, and then Detective Yoon comes in and says something."  Counsel asked that the tape be redacted so that only the portion the prosecutor contended was relevant be admitted.  The prosecutor agreed he would do so if possible.  Sanchez's attorney then offered to stipulate to the statements, but the prosecutor rejected the offer, saying the video "offers so much insight as to the defendant's demeanor and his ability to lie very convincingly."

Later the same day, the prosecutor informed the court that the transcript of the interview was finished and promised to provide it to Sanchez's attorney that day.  After the prosecutor expressed concern that he might be physically unable to edit the recording, Sanchez's attorney said, "Well, quite frankly, if the D.A. is trying to present this tape to show [Sanchez's] body language, . . . then I think that the jury should see the whole thing

20

because he's talking throughout the whole thing. So if that's what they want, then they can make an evaluation whether he's being forthright or not" to avoid "a skewed view of what that interview was and what it contained." The prosecutor agreed to play the entire interview, excluding only the silent portion.

At the next session of Sanchez's trial, Sanchez's attorney reasserted her relevance and Evidence Code section 352 objections to admission of the first recorded interview, focusing in particular upon statements by one of the detectives to the effect that Sanchez was suspected in Carlos's murder. (Undesignated statutory references refer to the Evidence Code.) The court and counsel ultimately agreed to start playing the recording after the detective's statement.

In asserting ineffective assistance of counsel, a defendant must overcome presumptions that counsel was effective and the challenged action might be considered sound trial strategy. (*Jones*, *supra*, 13 Cal.4th at p. 561.) Counsel is given wide latitude and discretion in the area of tactics and strategy, but the exercise of that discretion must be both founded upon reasonable investigation and preparation and reasonable and informed in light of the facts and options reasonably apparent to counsel at the time of trial. (*Id.* at pp. 561, 564–565.) In order to prevail on an ineffective assistance of counsel claim on appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. (*People v. Majors* (1998) 18 Cal.4th 385, 403.) "[C]ounsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

With respect to the first recorded interview, Sanchez argues that his attorney did not make a reasonable, informed tactical decision to have the entire recording played

21

because she did not have a transcript of the interview and "had no way of knowing what prejudicial information was in the interview."

Although Sanchez's attorney may not have had a transcript of the first recorded interview at the time she asked that the entire interview be played, her references to how much of the recording pertained to the statements the prosecutor wanted to introduce, the long gap of silence followed by Yoon speaking, and Sanchez "talking throughout the whole thing" demonstrate that counsel had the recording itself and had reviewed it. She did not need a transcript to make a reasonable, informed tactical decision about the relative prejudice and benefit to her client of introducing the entire recording.

Given defense counsel's tactical decision to have the entire recording played, and the wide latitude and discretion we accord counsel's tactical decisions, we cannot conclude that counsel's failure to attempt to exclude Sanchez's statement about being in jail five times was objectively unreasonable. She hoped to counter the prosecutor's use of the recording to demonstrate Sanchez's demeanor and body language when lying by providing an example of Sanchez's demeanor when he was probably being truthful.

Similarly, counsel may have had a sound tactical reason not to seek redaction of Sanchez's statement in the fifth recorded interview that he had prior arrests for driving without a license and possession of methamphetamine. Although this statement seemingly conflicted with the statement in the first recorded interview about having been in jail five times, one aspect of Sanchez's defense was his testimonial claim that he was under the influence of methamphetamine when he made all of his recorded statements to the police. Thus, the contradiction had some tendency to support Sanchez's claim of being under the influence during the first recorded interview. A belief that he was under the influence may have diminished the consciousness of guilt inference created by his statement implicating Valenzuela in Carlos's murder. In addition, an arrest for possession of methamphetamine tended to corroborate Sanchez's testimony about his heavy use of methamphetamine, and counsel could have concluded that Sanchez's admission of two arrests tended to show that he was telling the truth in the fifth recorded

22

interview. Given the minor nature of the two arrests, counsel could reasonably have concluded that the potential benefit of allowing the jury to hear this statement outweighed any potential harm. Thus, the record does not affirmatively disclose counsel's lack of a rational tactical purpose for failing to seek redaction of the statement.

In addition, Sanchez has not demonstrated a reasonable probability of a more favorable result if counsel had sought and obtained redaction of either or both of these statements. Sanchez admitted being a heavy and habitual user of methamphetamine, and indeed relied upon such use as part of his defense, both to portray himself as less culpable for the murder than Barba and to attempt to blunt the incriminating effect of his numerous statements to the police. Sanchez also admitted he was in the United States illegally and had been ordered deported. And he admitted participating in a brutal murder and gruesome cover-up. Sanchez's numerous statements to the police conflicted with one another and with his testimony at trial, supporting an inference of fabrication and minimization of his own culpability; his effort to prevent Valenzuela's sister and the police from discovering Valenzuela's death supported a strong inference of consciousness of guilt; Sanchez essentially admitted in his statements and his testimony his own role as an aider and abettor; and Banuelos's testimony tended to show that Sanchez was an equal participant with Barba in the murder. In addition, both juries were shown what they were told was a "prior booking photo" of Barba, onto whom Sanchez attempted to deflect the primary responsibility for Valenzuela's murder. Thus, Sanchez's jury effectively learned that both undisputed participants in Valenzuela's murder had prior arrests, which would tend to negate any inference that Sanchez was likely more culpable than Barba because he had prior arrests. It is not reasonably probable that hearing Sanchez's two statements about being in jail five times and having two arrests for relatively minor and innocuous offenses influenced the jury to convict Sanchez of murder. Indeed, a lack of prejudice may be inferred from the jury's not true finding on the personal use of a deadly weapon allegation against Sanchez.

23

Accordingly, we reject Sanchez's ineffective assistance of counsel claims regarding his jail and arrest statements.

**b.      Failure to object properly to question about beating or intimidating others**

On cross-examination, the prosecutor asked Sanchez whether he had beaten Valenzuela in the weeks before the murder. Sanchez initially responded, "What do you mean beat? Striking him in what way?" The prosecutor clarified he meant striking Valenzuela in any way. Sanchez denied doing so. Sanchez also denied that he held a knife to Valenzuela's throat about two weeks before the murder.

The prosecutor later asked Sanchez, "Did you beat or intimidate any other members of the immediate gay community in your residence?" At a side-bar conference, Sanchez's attorney sought an offer of proof. The prosecutor explained that Valenzuela's tax preparer "said that Sanchez is known for intimidating and physically abusing homosexuals in that area." Sanchez's attorney asserted she had not received this information in discovery. The prosecutor insisted it was in a report provided on the "discovery disk." The court permitted the prosecutor to ask the question. Sanchez responded, "Never."

Sanchez contends his trial attorney rendered ineffective assistance by failing to object to the prosecutor's question about beating or intimidating members of the local gay community on the ground that it sought evidence inadmissible under sections 1101, subdivision (a) and 1103, subdivision (b).

Section 1101, subdivision (a) provides, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1103, subdivision (b) permits a prosecutor to introduce "evidence of the defendant's character for violence or trait of character for violence" after the defendant has introduced "evidence that the victim had a character for violence or a trait of character tending to show violence."

We need not determine whether counsel's failure to object on a different ground was objectively unreasonable because no evidence of Sanchez's character or a trait of his character, whether for violence or otherwise was admitted through the question in issue. Sanchez denied he had beaten or intimidated members of the local gay community and the prosecutor did not attempt to introduce any evidence to refute that denial. The trial court instructed the jury that it "must determine what facts have been proved from the evidence received in the trial and not from any other source," the attorneys' questions were not evidence, and it must "not assume to be true any insinuation suggested by a question asked a witness." (CALJIC Nos. 1.00, 1.02.) We presume the jury followed these instructions. (*People v. Hinton* (2006) 37 Cal.4th 839, 864.)

c.      **Failure to object to aiding and abetting instructions**

The trial court instructed upon aiding and abetting using CALJIC Nos. 3.00 and 3.01. It instructed on the concurrence of act and specific intent using CALJIC No. 3.31.

Although Sanchez admits in his opening brief that these instructions correctly stated the elements of aider and abettor liability, he nevertheless contends in his opening and supplemental opening brief that the language of CALJIC No. 3.01 and distinctions between the language of CALJIC Nos. 3.00 and 3.31 created an ambiguity regarding the intent requirement and that defense counsel erred by failing to object to these instructions. We disagree that the instructions created any ambiguity.

An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.)

CALJIC No. 3.00, as given at Sanchez's trial, provided as follows: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty[] of a crime. Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime. [¶] When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts

25

of all the participants as well as that person[']s own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state."

CALJIC No. 3.01, as given at Sanchez's trial, informed the jury, "A person aids and abets the commission of a crime when he: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and in the absence of a legal duty to take every step reasonably possible to prevent the crime, the failure to prevent it does not amount to aiding and abetting."

CALJIC No. 3.31, as given at Sanchez's trial, provided as follows: "In the crimes and allegations charged, there must exist a union or joint operation of act and a certain specific intent and/or mental state in the mind of the perpetrator. Unless this specific intent and/or mental state exists the crime or allegation to which it relates is not committed or is not true. [¶] The specific intent and/or mental state required is included in the definition of the crimes or allegations set forth elsewhere in these instructions."

CALJIC No. 3.01 is substantively indistinguishable from the instruction approved in *People v. Beeman* (1984) 35 Cal.3d 547, 561, and is a correct statement of the requirements of aiding and abetting. (*People* v. *Tillotson* (2007) 157 Cal.App.4th 517, 532.) The instruction clearly and properly informed the jury that criminal liability as an aider and abettor requires that a person act "with the intent or purpose of committing or encouraging or facilitating the commission of the crime." No other instruction or portion of CALJIC No. 3.01 countermanded or diminished this requirement.

26

Sanchez argues the jury could have read CALJIC No. 3.01's statement regarding "[m]ere presence at the scene of the crime" that does not assist in the commission of the crime to mean that presence at the scene that assists in the crime constitutes aiding and abetting. We disagree. CALJIC No. 3.01 clearly informed the jury that in order to find Sanchez liable as an aider and abettor, the jury had to find each of the three numbered elements, including knowledge and intent.

Sanchez also argues CALJIC No. 3.31 created an ambiguity because it referred to "the perpetrator," whereas CALJIC No. 3.00 distinguished between "the actual perpetrator" and "the aider and abettor." We disagree. CALJIC No. 3.31 in no way negated, diminished, or cast confusion upon the requirements set forth in CALJIC No. 3.01. In addition, CALJIC No. 3.00 informed the jury, "When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person[']s own mental state."

Accordingly, because the instructions were not ambiguous, counsel's failure to argue that they were was neither objectively unreasonable nor prejudicial.

d.      **Failure to object to prosecutor's argument**

Sanchez contends his trial attorney erred by failing to object to argument by the prosecutor that "effectively sought to eliminate [the intent element of aiding and abetting] from the jury's consideration" "by insisting that Mr. Sanchez's testimony and his statements to the police, taken at face value, were in effect a confession of aiding-and-abetting liability." Sanchez bases his contention upon two statements by the prosecutor during his rebuttal argument: "He admitted to aiding and abetting. There's no question. He confirmed it at the end of the interviews. When somebody tells you, I'm going to kill your best friend. Go make sure that another person is out of the way, and you do exactly that, that's aiding and abetting a murder," and "What I mean by that is by aiding and abetting in the way that he did, by getting rid of Chupacabra, who is in the yard, and taking him into the house and keeping him busy for 15 minutes, that, in and of itself, is aiding and abetting murder."

27

Where a defendant claims a prosecutor engaged in misconduct in arguing the case to the jury, we consider whether, considering the challenged statements in the context of the argument as a whole, there is a reasonable likelihood that the jury construed or applied any of the challenged statements in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203.) "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 772.) A prosecutor has wide latitude to argue reasonable inferences from, and comment upon the evidence. (*Cole*, at p. 1203.) Whether the inferences the prosecutor draws are reasonable is for the jury to decide. (*Ibid.*)

Viewing the two statements upon which Sanchez relies in the context of the prosecutor's argument as a whole, we conclude the jury would have understood the prosecutor to be arguing that the jury could infer from Sanchez's admitted conduct that he possessed the requisite intent.

The prosecutor commenced his argument by stating, "[T]his case really amounts to a simple concept. That concept is that of aiding and abetting, assisting another person in the commission of a crime when you have knowledge that that person is committing that crime. From your [*sic*] actions, you infer that that person is intending to assist."

A little later, the prosecutor argued that in Sanchez's "original statements" he told the police Barba said to him, "'I'm going to kill him. But first, do me a favor,' and this is the first instance of aiding and abetting. 'Do me a favor. Take care of Chupacabra.' And at that point, Chupacabra is outside. 'Take him inside the house.' Just like Detective Rodriguez said, they have a name for that. It's called a lookout. You deflect witnesses. You make sure nobody is around so he can do what he does. [¶] What does he do? He does exactly that. Who in their right mind, if their friend of 13 years was being told [*sic*] by another individual, I'm going to kill him. I'm going to kill him. No uncertain terms, I'm going to kill him, are you just going to say, oh, okay. Not only am I not going to do anything, . . . but I'm going to take Chupacabra, . . . this individual says,

28

yeah, get rid of him. I'm going to do that. I'm not just going to do nothing. I'm going to actively help him, just like he wanted him to do. That's what he does. That's what he admitted to repeatedly in all three of those interviews."

While discussing inconsistencies and implausibilities in Sanchez's various statements and his testimony, the prosecutor argued, "Now, what do we know? And this reflects on his intent. And I think, ladies and gentlemen, you're going to see this, that when you review the defendant's story, it just doesn't make any sense other than he knew what he was doing as far as assisting this murder."

The prosecutor repeatedly argued that Sanchez's conduct in cutting a rope from the clothesline after Barba said Valenzuela was still breathing, then holding or pulling on one end demonstrated Sanchez's intent to kill. The prosecutor noted Banuelos testified that both Barba and Sanchez pulled on the rope "not meekly or weakly or momentarily, strongly, forcefully, and not for a short amount of time. 45 seconds to a minute. If that isn't intent to kill, I don't know what is." In discussing premeditation, the prosecutor reiterated that the second strangulation demonstrated Sanchez's intent to kill: "Both [Sanchez] and Mr. Barba on both ends pulled on that line for 45 to 60 seconds. No question that there was an intent to kill."

The prosecutor also set forth the elements of aiding and abetting and explained how the evidence supported each element: "Knew the unlawful person [*sic*]. Well, that's pretty logical. When you say you're going to kill somebody, it doesn't matter whether you know it's unlawful or not, but you know he's going to murder somebody. He's killing somebody. He was told directly by defendant Barba. Now, intended to facilitate a crime. He, based on his actions and based on his lies, not only on the stand here yesterday but throughout the interviews and his minimization, and not once but twice did he aid and abet, but also help[ed] dispose of the body. That's how you infer he intended to do it. And he actually aided. That's the cue [*sic*] word. He aided this crime. He actually helped. He was part and parcel of it."

In concluding, the prosecutor argued Sanchez was "guilty of aiding and abetting, helping directly kill this man. Make no mistake about it. If Sanchez didn't do what he did, Gonzalo Valenzuela would be alive. What he did was directly help and assist that murder. And based on [Banuelos's] testimony, there is no doubt as to what his intent was, none whatsoever."

In Sanchez's closing argument, his attorney argued he was an accessory after the fact, not an aider and abettor or direct perpetrator. She argued Valenzuela was already dead at the time of the second strangulation, and Sanchez did not aid and abet the first strangulation because he did not believe Barba was going to kill Valenzuela and thus lacked the requisite knowledge and intent.

In his rebuttal argument, before making the challenged remarks, the prosecutor stated, "Banuelos offered a great deal of insight in this case as to what was going through the minds of both of those individuals, both of them. He didn't see a quivering, scared Rolando Sanchez that night. . . . He saw a man who was working hand in hand with Barba. They were in it together. They carried the body together. They strangled that victim together for 45 seconds to 60 seconds."

After he made the challenged remarks, the prosecutor argued Sanchez's claimed methamphetamine use did not preclude him from forming the requisite specific intent: "[T]here's a difference between consuming a controlled substance and being under the influence to such an extent that you're unable, unable to form the specific intent to kill or know what you're doing. Based on his ability to recall the events in question, the detail that he goes into on those tapes, there is no question that he was not under the influence to negate his ability to form intent on the date of question. He intended to go inside the house to keep Chupacabra busy. He intended when he went outside to contact Barba. When he was contacted with [sic] Barba and was told, go inside the house, get a knife and cut down those clotheslines, he intended to do that."

Just before he concluded, the prosecutor argued, "[T]he original interviews recorded by three separate police investigations and investigators were [Sanchez's] most

30

recent and most accurate recollection of what occurred. Self-serving as they may be. And he makes key admissions to aiding and abetting murder. Mr. Banuelos corroborates those things and confirms what this man's intent was on that day without question, and that was not to let that man live, not to go get the police or anybody else to help. No. To be an active part of it, to be the look out, to cut down another weapon, and to ignore all opportunities to stop what was going on and to actively aid and assist that murder when he knew it was going on."

The prosecutor did not misstate the law. He repeatedly argued the jury could infer from Sanchez's actions that he had the intent required to be an aider and abettor. Because the prosecutor's argument was not improper or misleading, defense counsel's failure to object was neither objectively unreasonable nor prejudicial.

## 4. Cumulative error

Barba and Sanchez seek reversal on the basis of cumulative error. We have not identified any error that was prejudicial, whether considered separately or cumulatively.

### DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


CHANEY, J.


31