Filed 9/17/15  P. v. Hamilton CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. MARK HAMILTON, Defendant and Appellant. | D066030 (Super. Ct. No. SCD253847) |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Peter Quon, Jr., Randall Einhorn and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mark Hamilton of four counts of unauthorized use of personal identifying information (Pen. Code, § 530.5, subd. (a))[1] and one count of grand theft (§ 487, subd (a)). The trial court sentenced him to two years on the first identity theft count and imposed concurrent two-year sentences on the remaining counts. Defendant challenges the sufficiency of the evidence supporting his convictions on the identity theft counts. He also contends the trial court erred by denying his motion for mistrial premised on law enforcement agents' testimony he was initially detained on an arrest warrant and he possessed antigovernment writings when detained. Finally, defendant asserts the prosecutor engaged in misconduct by eliciting this prejudicial information and by misstating the evidence during closing argument. We reject these contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant represented himself at trial. The jury heard testimony from four Customs and Border Protection (Customs) officers, two San Diego Harbor Police officers, a special agent from the Social Security Administration's Office of Inspector General, a senior fraud investigator for Capital One, the assistant manager of the Travelodge motel where defendant resided, a landlord who rented defendant office space, an operations manager for AT &T Mobility, and a records custodian for Cox Communications. These witnesses provided the following evidence.

---

[1]     Unspecified statutory references are to the Penal Code. We will refer to the unauthorized use of personal identifying information by the shorthand term "identity theft," even though the former is broader than the latter. (See *People v. Barba* (2012) 211 Cal.App.4th 214, 226-227 (*Barba*).)

2

On the afternoon of February 14, 2014, defendant arrived at San Diego International Airport on an international flight. Customs officers detained him on an outstanding arrest warrant from Arizona and searched his belongings. The officers found in defendant's luggage several credit cards with names other than defendant's; a paper with a list of names next to what appeared to be Social Security numbers (SSN's) and dates of birth; junk mail; and antigovernment writings. Based on the outstanding arrest warrant, Customs officers delivered defendant and his belongings to the harbor police, which patrols the airport.

As part of the follow-up investigation, the Social Security Administration special agent examined nine of the numbers on defendant's list and confirmed eight of them were valid SSN's that belonged to minors in Georgia and Washington.[2] She noted that the names next to the numbers on defendant's list did not match those in the Social Security Administration's database. The agent explained that minors' SSN's are of particular value to identity thieves because the minors do not have negative credit reporting or conflicting information. In her experience investigating fraud and identity theft, the agent has seen "cases where credit cards were established using numbers of minors, and then the cards were charged up, and then the banks lose money because the person who is using the Social Security number of a minor doesn't pay the debts that they have incurred." The agent testified that private citizens and companies do not have access to the Social Security Administration's database; however, there are other ways to obtain someone

---

[2] The agent confirmed the ninth number was not an SSN.

3

else's SSN: it could be "made up," "mined from the Internet," "mined from trash," or overseen by a relative or acquaintance.

The senior fraud investigator from Capital One testified that between August and November 2013 someone used four of the SSN's found on defendant's list to apply for credit cards in the names of Lord Hamilton, Renacio Montoya, Scott Wellington, and Justin Manor. Capital One issued credit cards in those names, each with a credit limit of $500, with the exception of the card issued in the name of Justin Manor, which had a credit limit of $300.

When the applications were submitted to Capital One, defendant was living at the Travelodge motel in El Cajon and was renting office space on Camino Del Rio South in San Diego. Two of the credit cards were applied for using an Internet connection at the Travelodge and referenced the motel's address as the accounts' mailing address;[3] another card used the Camino Del Rio South address as its mailing address.[4] The four accounts were later accessed using telephone numbers associated with defendant and the motel.

The fraud investigator described a scheme known as a "bust-out." He explained that when a cardholder submits an ostensible payment, Capital One immediately credits

---

[3] An unsuccessful fifth application also referenced the Travelodge address as the mailing address for the account.

[4] The record does not make clear how each of the four credit card applications was submitted. The Capital One investigator testified from an exhibit that apparently contained this information (along with additional account details), but that exhibit is not included in the record on appeal. In any event, defendant does not contend on appeal that he did not open the four accounts.

4

the cardholder's account in the full amount of the payment, even before the payment clears. This effectively raises the account's credit limit by the amount of the payment. In a bust-out scheme, the cardholder submits an invalid payment, obtains an immediate increase in his effective credit limit, and then charges up to the amount of this new limit—all before Capital One discovers the payment is invalid. Once Capital One discovers the payment is invalid, the credit limit is restored to its original level and Capital One incurs a loss on the excessive charges.[5]

The investigator testified that someone using a phone number associated with defendant made ostensible payments to the credit card accounts in the names of Lord Hamilton, Renacio Montoya, Scott Wellington, and Justin Manor. All the payments were immediately credited, but subsequently returned as invalid.[6] During the payment-validation window, several charges were made to the accounts. As a result, charges incurred on three of the accounts exceeded their corresponding credit limits.[7] No valid

---

[5] For example, if the cardholder has a credit limit of $500 and makes a $500 payment on day one, he will immediately have an effective credit limit of $1,000. The cardholder is able to accumulate up to $1,000 in charges on the account until day three, when Capital One discovers the $500 payment is invalid and the credit limit is returned to $500. In the meantime, however, the cardholder accumulated an additional $500 in charges beyond his initial credit limit, which Capital One incurs as a loss (in addition to any charges below the original credit limit for which the cardholder does not ultimately pay).

[6] Some of the payments were drawn on the accounts of various other banks' customers who had not authorized the charges; others were charged to a fictitious account.

[7] The credit card issued in the name of Renacio Montoya with a $500 credit limit had a balance of $2,316.14; the credit card issued in the name of Justin Manor with a

payments were ever made on any of the accounts. The total loss to Capital One was $3,759.55.

After deliberating for one afternoon, the jury returned guilty verdicts on all counts. Defendant admitted he had two prior convictions that rendered him ineligible for probation. The court sentenced defendant to two years on the first identity theft count and imposed concurrent two-year sentences on the remaining counts.

## DISCUSSION

### I.

### *SUBSTANTIAL EVIDENCE*

To violate section 530.5, subdivision (a), the defendant must (1) willfully obtain personal identifying information of another person, (2) use the identifying information for an unlawful purpose, and (3) do so without the person's consent. (*Barba, supra*, 211 Cal.App.4th at p. 223; *People v. Tillotson* (2007) 157 Cal.App.4th 517, 533.)[8] Defendant contends none of these elements are supported by substantial evidence. We disagree.

---

$300 credit limit had a balance of $396.65; and the credit card issued in the name of Lord Hamilton with a credit limit of $500 had a balance of $926.77. The fourth credit card, issued in the name of Scott Wellington, did not incur charges in excess of its $500 credit limit, but did have a balance of $119.99.

[8] Section 530.5, subdivision (a) provides: "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit . . . without the consent of that person, is guilty of a public offense . . . ." Section 530.55, subdivision (b)'s definition of personal identifying information includes SSN's.

6

"In determining the sufficiency of the evidence, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Horning* (2004) 34 Cal.4th 871, 901.) "The standard of review is the same when the prosecution relies mainly on circumstantial evidence." (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

Substantial evidence supports each element of the offense. The special agent from the Social Security Administration testified she examined nine of the numbers that were in defendant's possession and confirmed eight of them were valid SSN's belonging to minors. She also testified to the added value minors' SSN's have to identity thieves. This is strong circumstantial evidence from which the jury could reasonably have inferred that defendant willfully obtained those SSN's from some source—for example, mined them from the Internet—and that he did not simply make them up, as he suggests. Accordingly, substantial evidence supports the jury's finding that defendant willfully obtained the personal identifying information of other persons.

Regarding the second element—use of the personal identifying information for an unlawful purpose—Capital One's senior fraud investigator testified someone opened four credit card accounts using the SSN's that were on the list found in defendant's possession. The investigator and other witnesses established that several of the accounts were opened online using an Internet connection at the motel where defendant resided; several of the accounts used defendant's residential and business addresses as their mailing addresses;

7

defendant accessed the accounts using his phone and his Internet connection at the Travelodge motel; and defendant's phone number was used to make invalid payments on the accounts consistent with a bust-out scheme.  Thus, substantial evidence supports the jury's finding on the second element.

In attacking the jury's finding on the second element, defendant cites *People v. Hagedorn* (2005) 127 Cal.App.4th 734 (*Hagedorn*) to support the proposition that a defendant who uses another person's personal identifying information to obtain credit must do so " 'in the name of the other person.' " (*Id.* at pp. 746-747.)  Defendant reasons that because he opened the credit card accounts in names that do not correspond to the SSN's he used, insufficient evidence supports the jury's finding that he obtained credit "in the name of" the SSN holders.  This argument fails because when *Hagedorn* was decided, section 530.5, subdivision (a) "prohibited the willful obtaining and use of another person's identifying information '*in the name of the other person*.' " (*Barba, supra*, 211 Cal.App.4th at p. 224, italics added.)[9]  The Legislature deleted "in the name of the other person" from section 530.5, subdivision (a) in 2006.  (*Barba*, at p. 224.)  Therefore, it is of no moment that defendant opened the accounts with SSN's that do not correspond to the true holders' names.

---

[9]     Before 2006, the relevant language of former section 530.5, subdivision (a) stated: ". . . and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information *in the name of the other person* without the consent of that person . . . ." (Stats. 2006, ch. 10, § 1; see Stats. 2006, ch. 522, § 2, italics added.)

Defendant's other attack on the second element also lacks merit. He argues that because Capital One requires only a valid SSN to open a credit card account, regardless of whether the name on the application matches the name associated with the SSN (as reported by credit bureaus), "[i]f there was any misleading, Capital One misled itself."[10] However, defendant acknowledges that section 530.5, subdivision (a) "does not require an intent to defraud, *nor does it matter that no one was harmed*." (Italics added; see CALCRIM No. 2040 ["It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts."].) The statute requires only that the defendant use another person's personal identifying information (here, SSN's) for an unlawful purpose (here, "to obtain . . . credit"). (§ 530.5, subd. (a).) Further, section 530.5, subdivision (a) "is intended to protect the person or entity . . . whose personal information has been misappropriated and used for an unlawful purpose," not the person or entity defrauded by the defendant's unlawful use of that information. (*Barba, supra*, 211 Cal.App.4th at p. 226; *People v. Valenzuela* (2012) 205 Cal.App.4th 800, 808 [the crime of identity theft was created "because the harm suffered by identity theft victims went well beyond the actual property obtained through the misuse of the person's identity. Identity theft victims' lives are often severely disrupted. For example, where a thief used the victim's identity to buy a coat on credit, the victim may not be liable for the actual cost of the coat. However, if the victim was initially unaware of the

---

10    The fraud investigator explained that Capital One does not require the SSN and name to match because cardholders often use nicknames or inadvertently transpose first and last names when applying for credit card accounts.

9

illicit transaction, the damage to the person's credit may be very difficult to repair."].)
Even if harm to Capital One were required, its investigator testified that Capital One suffered a $3,759.55 loss as a result of the accounts defendant opened using others' SSN's.

Finally, substantial evidence supports the jury's finding that defendant used the SSN's without their holders' consent. Assuming for the sake of argument that minors would have the legal capacity to consent to a third party's use of their SSN's to obtain credit, it defies reason that they would grant consent under the circumstances here— defendant has no apparent connection to the SSN holders and used their SSN's in a textbook bust-out scheme to incur thousands of dollars in debt without ever making a valid payment. This circumstantial evidence is sufficient to support the jury's finding. (*People v. Valdez, supra*, 32 Cal.4th at p. 104.)

Substantial evidence supports the jury's findings on each element of the identity theft counts.

II.

*JURY'S EXPOSURE TO PREJUDICIAL MATTER*

Defendant contends the trial court erred by allowing the jury to be exposed to prejudicial material. First, he contends the court erred by not granting a mistrial after a harbor police officer twice testified that defendant was initially detained at the airport on an outstanding arrest warrant. Second, he contends the court erred by "utterly fail[ing] to ensure that the jury was not exposed (repeatedly)" to testimony that defendant had antigovernment writings in his belongings. Neither contention is persuasive.

10

*A.     Proceedings Below*

*1.      References to the Arrest Warrant*

Before trial, the court admonished the prosecutor to instruct his witnesses not to mention that defendant was detained at the airport on an outstanding arrest warrant. The court recommended that the prosecutor have each testifying officer sign an agreement that he or she would not mention the warrant. The prosecutor specifically admonished his witnesses not to mention the warrant, but said he forgot to have them sign an agreement to that effect.

During trial, 28-year-veteran harbor police Officer Cynthia Markley twice mentioned the arrest warrant:

> "Q.            And were you at one point called to the secondary
>                for Customs and Border Patrol?"
>
> "A.            Yes."
>
> "Q.            What was it related to?"
>
> "A.            It was [in] reference to an individual they had
>                detained who had a felony warrant."
>
> "Mr. Hamilton:  Objection."
>
> "The Court:    Was there an objection?"
>
> "Mr. Hamilton:  Objection."
>
> "The Court:    The jury will disregard that last statement."
>
> "Q.            Were you called to Customs and Border
>                Protection with regard to a person known as Mark
>                Hamilton?"
>
> "A.            Yes."

"Q.        And were items provided to you that were found during a search of his effects?"

"A.        Yes."

"Q.        Can you explain what those items were?"

"A.        They were—there were some credit cards that were issued in different names."

"Q.        And what other items?"

"A.        There was some paperwork that Customs was concerned with regards to Mr. Hamilton's travel, and they also indicated that there was a warrant for his arrest."

"Mr. Hamilton: Objection."

"The Court:        Sustained.  Jury should disregard the last statement."

After Officer Markley's testimony, the court met with her, the defendant, and the prosecutor outside of the jury's presence.

The court asked Markley, "So officer, what were you thinking when you brought up that there was a[] felony arrest warrant for [defendant]?"  She responded, "Just answering the question."  The court then addressed how to proceed:

"The Court:        So where do we go from here?  Number one, it was totally inappropriate, and you would think after the number of years that this officer had that she would understand when it was sustained the first time that that was something that she shouldn't go into."

"But then again she volunteers it again.  So either you are asking questions in such a way that you're inviting the problem, you didn't choose the approach I suggested to you and I told you.  The only way that I have found—the only way to make sure that doesn't happen is to make an officer sign

12

it that they understand they cannot bring it up.  And this is one of the best examples.

"So technically, the defendant is entitled to a mistrial.  If he makes that motion, I'm going to grant it.  So he has a right to make a motion for a mistrial.

"All that means, though, Mr. Hamilton, before you get too excited about it, it means that we just put your trial off for another time period, and we just try it again.  We start again from scratch."

"Mr. Hamilton:  Do I need to do—put that motion in verbally or—"

"The Court:  Verbally if that's what you want to do.  You just need to think it out real carefully because sometimes people want to do it and sometimes they don't."

"Mr. Hamilton:  I do want to move for a mistrial based on the fact that information presented was very prejudicial."

"The Court:  I don't blame him.  Let me see if there is a way we can get around it. . . .  What was the warrant for in Arizona and was it even for him?"

"[Prosecutor]:  Yes, it was for him.  It is a felony extradition warrant for theft-related offenses.  I'm not sure of the detail in terms of what the offenses are in Arizona.  That was the reason he was identified by Customs and Border Protection."

[¶] . . . [¶]

"The Court:  There's no way I can help correct that, then.  [¶] . . . [¶]  So I just want to make sure that you understand if I grant the motion for a mistrial that what happens is that then we will set a new trial date.  It will be at least 30 days off.  This may be helpful to you to get some more witnesses that you wanted or do more work that you're talking about, but you're going to stay in custody for that additional time period.

13

"So if you make a motion, I can tell you right now I'm going to grant it because I think that there's a problem with the officer volunteering that information. I can give the jury a more forceful admonition. I try not to do too much because sometimes it tends to highlight things and make it worse, depending upon the way the admonition is given. So I just try to give the admonition and have everything move on as if it's not a big deal.

"But if that happens, we will have to put the trial off for at least 30 days. And frankly, if I grant a mistrial, we have up to 60 days to try you from the date of the mistrial."

Defendant asked whether the delay and resulting inconvenience to the witnesses would be grounds for dismissal of the action. The court told him it would not. The court warned defendant that if he did not move for a mistrial then, the court "most likely" would not grant a motion for new trial on this ground after a guilty verdict and "it would not be grounds for a reversal on appeal."

The court asked defendant, "Do you want to think about it over the break?" Defendant began to respond, "No," but the court interrupted: "Actually, you know what I'm going to do, I'm going to give you until tomorrow morning to decide. Think about it a little bit. I'm going to give everybody a break."

The next morning, court began with the following exchange:

"The Court:        . . . Mr. Hamilton, have you made a decision as to whether you are going to request a mistrial?"

"Mr. Hamilton:  At this time, Your Honor, I'm going to reserve my right to request a retrial."

"The Court:        That's not going to work. Either now or else the odds of me granting it are slim and none."

14

"Mr. Hamilton:   I understand the odds.  I still want to reserve the right."

"The Court:       Are you requesting it at this time?"

"Mr. Hamilton:   No, I am not."

After the guilty verdict, defendant had "a change of heart" and moved for a new trial based on Officer Markley's references to the arrest warrant and alleged prosecutorial misconduct.  Defendant acknowledged in his motion that he "did not consent to a mistrial" when given the opportunity because he did not fully understand the ramifications of a mistrial and wanted to conduct research so he "could make an intelligent decision."  At the hearing on defendant's motion, he again acknowledged, "the mistrial option was offered to me during the trial by the Court, and at that time I refused or declined and I reserved my right to request a mistrial later on . . . ."  The court denied defendant's motion with the following explanation:

> "As far as the misconduct issue, there is—I can't say that there's misconduct on the part of the deputy district attorney.  The officer should have known better, and the first time I struck it and told the jury that they could not consider it.  It only talked about a warrant.  It didn't say what the warrant was for.  It was in the overall scope of things in terms of evaluating how that would play out to cause an unfair trial.  I don't think it did.  When I step back and look at the whole thing, and I have to eliminate my frustration with the officer because obviously the second time when the officer did it, the same result, I was unhappy with the officer, and I don't believe I was required at that point to grant you a mistrial, but I felt like that was the appropriate thing to do at that particular stage, and I gave you the opportunity to request a mistrial.

> "And I indicated that if you requested it, I would grant it.  There are times where I phrase it along these lines that as a courtesy I would do it.  An [admonition] on that type of statement should be adequate.  There are different ways we can give it.  We can give the

15

admonition[;] there's a question as to whether the admonition is done in such a way as to overly highlight it. I don't believe it was overly highlighted. It was there, but I don't believe that it resulted in prejudice to the defendant that requires a mistrial. So your motion is denied."

2.      *References to Antigovernment Writings*

During trial, one Customs officer testified that he found in defendant's luggage "some information that dealt with like, I want to say like, someone who is—not had strong feelings toward the country. Some stuff that sets off almost a terrorist type alert with us." The officer said the materials were "above [his] . . . pay grade" so he took them to his supervisor, who determined they were "of no concern."

Another Customs officer testified that in searching defendant's luggage, "[t]here was a lot of material brought forth, some antigovernment writing, some national security issues, some credit cards that didn't belong—they weren't in his name."

As discussed above, Officer Markley testified she was contacted by Customs, in part, because "[t]here was some paperwork that Customs was concerned with regards to Mr. Hamilton's travel." Presumably she was referring to the antigovernment writings.

Defendant did not object to any of these references to antigovernment writings.

B.      *Relevant Law*

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 683 (*Ledesma*); see *People v. Bolden* (2002) 29 Cal.4th 515, 555 ["we use

16

the deferential abuse of discretion standard to review a trial court ruling denying a mistrial"].)

Similarly, "[b]ecause a ruling on a motion for new trial rests so completely within the trial court's discretion, we will not disturb it on appeal absent ' " 'a manifest and unmistakable abuse of discretion.' " ' " (*People v. Earp* (1999) 20 Cal.4th 826, 890.) " '[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.' " (*People v. Dyer* (1988) 45 Cal.3d 26, 52.)

*C.     Analysis*

Whether based on a motion for mistrial or a motion for new trial, the trial court did not abuse its discretion by declining to grant defendant a new trial based on either Officer Markley's references to the arrest warrant or the references to antigovernment writings.

Officer Markley's references to the arrest warrant were fleeting, unsolicited, and nonresponsive. For all the jury knew, the warrant could have related to the crimes for which defendant was currently being tried. In any event, the trial court promptly and briefly admonished the jury to disregard each reference, cognizant that a more elaborate admonition might draw more attention. The court did not abuse its discretion in concluding its admonitions were sufficient to dispel any prejudice that may have resulted. (See, e.g., *Ledesma, supra*, 39 Cal.4th at p. 683 ["no basis for concluding . . . that the knowledge that defendant previously had been convicted of murder and sentenced to death [in prior proceedings in the same case] was incurably prejudicial"]; *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 [reference to defendant's parole officer

17

harmless in light of overwhelming evidence of guilt]; *People v. Jennings* (1991) 53 Cal.3d 334, 380 [no prejudice from "three isolated incidents of blurted-out, nonresponsive answers" revealing defendant had previously been arrested and incarcerated].)

Nothing about the procedure in the trial court compels a different conclusion. Defendant seizes on the trial court's initial statement that it would grant a mistrial if defendant moved for one. However, the court's comment did not create some sort of irrevocable unilateral contract that required the court to immediately declare a mistrial if defendant moved for one. The court concluded the self-represented defendant would benefit from having additional time to consider the ramifications of moving for a mistrial—ramifications that would include an additional 30 to 60 days in custody. With the benefit of that additional time, defendant changed his mind and decided *not* to move for a mistrial after all. It was only after the jury returned a guilty verdict that defendant had a "change of heart" and raised the issue again. The trial court also benefitted from deferring the issue, realizing in hindsight that its initial comments were the result of frustration with Officer Markley's repeated and unsolicited references to the warrant. Distanced from that frustration, the court concluded Markley's references to the warrant were not unduly prejudicial. We agree.

Defendant's claim of error arising from the witnesses' references to the antigovernment writings also fails. To begin with, defendant forfeited this challenge by failing to object during trial. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 409.) The argument also fails on the merits. The references to the antigovernment

18

writings were nondescript and brief.  Moreover, one of the Customs officers testified his supervisor determined the materials were "of no concern."  On this record, the trial court did not err.

Even if the trial court erred with respect to the references to the warrant or the antigovernment writings, any error was harmless in light of the overwhelming and largely uncontested evidence against defendant.  He was detained with a list of names, SSN's, and credit cards in other people's names.  Internet and phone records show defendant applied for, accessed, and made invalid payments on the credit card accounts.  Defendant's residential and business addresses were used as the mailing addresses for most of the accounts.  And the cards were used in a textbook bust-out scheme.  Although circumstantial, this evidence is nonetheless overwhelming.

## III.

### *PROSECUTORIAL MISCONDUCT*

Defendant contends the prosecutor engaged in misconduct by eliciting inflammatory matter when examining witnesses (the arrest warrant and antigovernment writings) and by misstating evidence during closing argument (arguing the minors had not consented to the use of their SSN's).  We see no misconduct.

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the

defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "  [Citation.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 (*Fuiava*).)  "A witness's nonresponsive answer cannot be the basis of a claim of prosecutorial misconduct." (*People v. Tully* (2012) 54 Cal.4th 952, 1039 (*Tully*); see *People v. Scott* (1997) 15 Cal.4th 1188, 1218 (*Scott*) ["Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct."].)  "A prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 736 (*Edwards*).)  Failing to object to misconduct and to request an admonition that the jury disregard the misconduct forfeits the issue on appeal, unless an objection would have been futile or an admonition ineffective. (*Tully*, at p. 1011; *Fuiava*, at p. 679.)

The prosecutor did not engage in misconduct with respect to Officer Markley's references to the arrest warrant.  He specifically instructed Markley not to mention the warrant during her testimony.  In light of that admonition, Markley's references to the warrant were largely nonresponsive to the prosecutor's questions.  Consequently, the prosecutor's questioning was not improper. (*Tully, supra*, 54 Cal.4th at p. 1039; *Scott, supra*, 15 Cal.4th at p. 1218.)

20

As for the prosecutor supposedly eliciting references to antigovernment writings, defendant's failure to object at trial forfeits the issue on appeal. (*Tully, supra*, 54 Cal.4th at p. 1011; see *Fuiava, supra*, 53 Cal.4th at p. 679.) In any event, we are satisfied that the Customs officer's testimony that his supervisor determined the materials to be "of no concern" dispelled any potential prejudice. Notably, *the prosecutor* specifically elicited that mitigating testimony.

Finally, we reject defendant's claim of misconduct arising from the prosecutor's closing argument. Regarding the consent element of the identity theft counts, the prosecutor twice asked the jury to make "the inferential leap" based on circumstantial evidence that the minors did not consent to the use of their SSN's. It was not misconduct for the prosecutor to argue " 'reasonable inferences or deductions to be drawn' " from the evidence. (*Edwards, supra*, 57 Cal.4th at p. 736.)

## DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.


21